COMMONWEALTH *vs.* GEORGE JUNG
(and nine companion cases[1]).

Bristol. March 8, 1995. - June 26, 1995.

Present: LIACOS, C.J., WILKINS, ABRAMS, & GREANEY, JJ.

*Constitutional Law*, Search and seizure, Self-incrimination. *Search and
Seizure*, Exigent circumstances, Warrant, Administrative inspection.
*Fire.*

Fire officials lawfully made a warrantless entry in a single-family dwelling,
    in conjunction with the fire department's ongoing overhaul operations
    after extinguishing a fire in the building and for the purpose of con-
    ducting a general survey to investigate the cause and origin of the fire,
    and evidence obtained during that entry should not have been sup-
    pressed. [681-683]
Investigators lawfully entered a fire-damaged dwelling pursuant to an ad-
    ministrative warrant on a showing that a fire of undetermined origin
    had occurred on the premises, and a criminal search warrant was not
    required. [684-685]
The scope of an affidavit in support of an administrative warrant and the
    resulting warrant authorizing fire officials' search of an entire burned
    structure was unreasonably and unwarrantedly broad where investiga-
    tors had concluded prior to applying for the warrant that the fire had
    originated in the basement of the building, and evidence discovered
    during the search conducted pursuant to the warrant should have been
    suppressed. [685-686]
In an arson case, the issue of the admissibility of evidence gathered by an
    insurance investigator at the scene of a fire was remanded for consider-
    ation of further evidence and for findings with respect to any coopera-
    tion and involvement of police and fire officials with the investigator as
    might be sufficient to trigger the protections of the Fourth Amendment
    to the United States Constitution. [686-687]
In the circumstances of police officers' interrogations of two owners of
    property in connection with an arson investigation, Miranda warnings
    were not required where the interviews were not custodial; the judge at

[1]Four additional indictments against George Jung, and five indictments
against the codefendant, Wendy L. Degregorio.

a subsequent arson trial correctly declined to suppress the defendants' statements to police. [687-689]


INDICTMENTS found and returned in the Superior Court Department on May 6, 1992.

A pretrial motion to suppress evidence was heard by *Walter E. Steele*, J.

An application for leave to prosecute an interlocutory appeal was allowed by *Nolan*, J., in the Supreme Judicial Court for the county of Suffolk, and the appeal was reported by him to the Appeals Court. The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Christopher Markey*, Assistant District Attorney (*Elspeth Cypher*, Assistant District Attorney, with him) for the Commonwealth.

*J. Drew Segadelli* for Wendy L. Degregorio.

*Orlando F. de Abreu* (*David O. de Abreu* with him) for George Jung.

GREANEY, J. The defendants, George Jung and Wendy L. Degregorio, were indicted on charges of burning a dwelling, in violation of G. L. c. 266, § 1 (1992 ed.); burning a dwelling with intent to defraud, in violation of G. L. c. 266, § 10 (1992 ed.); filing false insurance claims, in violation of G. L. c. 266, § 111A (1992 ed.); conspiracy to burn a dwelling, in violation of G. L. c. 274, § 7 (1992 ed.); and conspiracy to burn a dwelling with intent to defraud, also in violation of G. L. c. 266, § 1 (1992 ed.). The defendants filed a motion to suppress evidence obtained in inspections of their fire-damaged home by fire, police, and insurance investigators and personnel, and statements made by them to the police. In support of the motion, they argued that the inspections were improper in the absence of valid administrative and criminal search warrants, and that the statements were obtained in violation of their rights against self-incrimination. A judge in the Superior Court conducted an evidentiary hearing on the motion and entered a memorandum of deci-

sion in which he allowed the defendants' motion in part and denied it in part. A single justice of this court allowed applications by the Commonwealth and the defendants to pursue interlocutory appeals. See Mass. R. Crim. P. 15 (b) (2), as amended, 397 Mass. 1226 (1986). We affirm the order of the judge in part and reverse it in part.

We summarize the relevant background based on the judge's findings of fact. On the night of May 25, 1991, a fire was reported at a single-family, two-story home in Seekonk owned by the defendants and occupied by them as their residence. The Seekonk fire department arrived on the scene at 11:23 P.M. and brought the fire under control by 2 A.M. on May 26. The fire was extinguished, and the fire apparatus recalled at 4:56 A.M. Overhaul operations, which included securing the premises, preserving salvageable property, and preventing rekindling of the fire began at that time and continued throughout the morning.

Seekonk Fire Chief David Viera arrived on the scene in the early morning hours and remained at least until late morning. At some point in the early morning, Viera called Attleboro Fire Chief Ronald M. Churchill and the State fire marshal's office for assistance in investigating the fire. Churchill arrived at 8 A.M., and State Trooper Frank Hummel of the State fire marshal's office arrived shortly thereafter. Viera also called Detective Russell L. Brennan of the Seekonk police department to assist in the investigation and to take photographs.

At 8:20 A.M., the four men entered the defendants' home without obtaining their consent or a warrant. During this inspection (first search), the investigators determined that the fire had originated in the basement, which (the judge found) was then submerged under four feet of water. They also observed that there were no pictures on the walls of the home, despite the presence of picture hooks. By 10:50 A.M., Churchill formed the opinion that the fire was "probably set," and the investigators left the home. Churchill then informed the others that an administrative warrant should be obtained while the water was pumped from the basement. He provided

Chief Viera with a form affidavit and warrant application, and Viera authorized Detective Brennan to obtain the warrant. An administrative fire inspection warrant was issued by a clerk-magistrate in the Taunton District Court later that day pursuant to the affidavit and application filed by Brennan.[2]

On May 27, the defendants arrived at the fire scene where they were met by Detective Brennan. Brennan arranged an interview with the defendants to be held at police headquarters in Seekonk on May 29. Brennan did not obtain the defendants' consent to search their home, but he did inform them that an administrative warrant had been obtained.

On May 28, after the water had been drained from the basement, Churchill, accompanied by Hummel, Brennan, and Viera, investigated the home for a second time (second search). In addition, the fire department arranged for a local technician to examine the oil burner. The technician found the oil burner to be in working condition and concluded that it had not caused the fire. The water heater was also excluded as the fire's origin by Churchill, who had determined that the fire began in two separate locations in the basement and had burned simultaneously in the two locations during

[2]The administrative fire inspection warrant and the affidavit in support of the application for the warrant were on preprinted forms. The affidavit form contained blank spaces for (1) an applicant's identity; (2) the nature of his or her employment; (3) the date, location, and particular description of the premises to be searched; (4) the date and time at which the fire under investigation was reported and was brought under control and extinguished; (5) a list of the previous entries onto the subject premises for purposes of investigation; (6) the reason for entry (or reentry); (7) a description of the specific area to be searched; and (8) the time at which the search would be conducted.

The administrative fire warrant form authorized an "administrative fire inspection" for purposes of "investiga[ting] the cause, origin and circumstances of the fire," and authorized the applicant for the warrant to enter and visually inspect and photograph the defendants' home without limitation as to the area to be searched. The warrant further authorized seizure of samples of burned materials, and elements of the heating and electrical systems or appliances if necessary, for the purpose of determining the cause and origin of the fire. The search was to be conducted "in light of *Michigan* v. *Tyler*, 436 U.S. 499 (1978)."

its early stages. Churchill also found evidence of a deliberate arrangement of fuels designed to implicate the oil burner or water heater as the point of the fire's origin. Churchill concluded that the fire was incendiary in origin and that it had no possible accidental source.

The four investigators also noted that support beams had been removed from the basement, observed once again that pictures were not on the walls despite the presence of picture hooks, and observed that personal items and "knickknacks" one would ordinarily expect to find in a home were not present. It was also noted that the skylights had been left open and that this ventilation had accelerated the fire. The doors and windows to the house had been locked prior to the fire and there was no sign of a break-in. The home was subsequently ordered condemned and boarded.

Detective Brennan interrogated the defendants on the morning of May 29. At the time, he was aware that investigators had concluded that the fire was the result of arson and that doors and windows had been secured when the firemen arrived. The defendants had previously told Brennan that they were away for the weekend in Pennsylvania. Brennan also knew at the time of the interrogation that fire insurance coverage on the house had recently been increased from $95,000 to $286,000.

Brennan interviewed the defendants separately. At some point during his interview, Brennan advised Jung of his Miranda rights. He then questioned Jung about the support beams, eliciting various responses. Jung became agitated and ended the interview. Brennan never advised Degregorio of her Miranda rights during the course of her interview. Although neither defendant admitted to any criminal conduct, their statements were inconsistent on certain important points on which both were questioned.[3]

---

[3]Although the judge made no finding on this point, the undisputed testimony at the hearing was that, after the interviews ended, the defendants left the police station.

While Brennan was conducting these interviews on May 29, Vincent Calenda, a private investigator, was conducting an investigation on behalf of Cambridge Mutual Insurance Company, the carrier from whom the defendants had purchased insurance. Viera allowed Calenda access to the home and, because the second-floor staircase had partially collapsed, allowed him to use a Seekonk fire department ladder truck to conduct an aerial inspection of the second floor (third search). Calenda's report detailed the evidence discovered the previous day by Churchill as well as new evidence.

Brennan returned the administrative warrant on May 31, indicating that he had complied with the warrant requirements during the investigations of May 28 and 29. He made no mention of Calenda's investigation. Officials never obtained a criminal search warrant.

Based on these findings, the judge ruled that the first search (conducted on the morning of May 26) violated the Fourth Amendment to the United States Constitution because the defendants maintained a reasonable privacy interest in their property and no exigency existed justifying the warrantless entry. The judge upheld the second search (conducted on May 28) on the basis that the administrative warrant, although issued on a preprinted form, met all of the requirements set forth by the United States Supreme Court in *Michigan* v. *Clifford*, 464 U.S. 287 (1984). The judge concluded that a criminal search warrant had not been necessary because the search had not turned from an investigation of the cause and origin of the fire into a criminal arson investigation. The judge ruled that evidence obtained by the insurance investigator in the third search could not be used against the defendants because the investigator had substantial assistance from government officials who were, at that point, conducting a criminal investigation. Lastly, the judge concluded that the interrogations of the defendants did not violate their rights against self-incrimination, protected by the Fifth Amendment to the United States Constitution, because the interrogations had not been custodial in nature.

In reviewing a motion to suppress, we accept the motion judge's findings of fact absent clear error. *Commonwealth* v. *Costa*, 414 Mass. 618, 626 (1993). "[T]he ultimate legal conclusion to be drawn from the fact[s] developed at the hearing is a matter for our review, particularly where the conclusion is of constitutional dimension." *Commonwealth* v. *Accaputo*, 380 Mass. 435, 448 n.18 (1980). *Commonwealth* v. *Thinh Van Cao*, 419 Mass. 383, 384 (1995). We are concerned only with issues of Federal constitutional law, the defendants having raised no issue below under the Declaration of Rights to the Massachusetts Constitution. See *Commonwealth* v. *Garcia*, 409 Mass. 675, 678-679 (1991).

1. *First search.* The judge concluded that the first search, for which officials had neither a warrant nor the consent of the defendants, constituted an illegal search under the Fourth Amendment. The Commonwealth argues that the judge erred in suppressing evidence gathered during this search because officials needed no warrant to enter the home to investigate the origin and cause of the fire so long as the entry occurred within a reasonable interval after the fire was extinguished. We agree with the Commonwealth that the limited first search was permissible, and that any evidence obtained in the course of this incursion into the defendants' home should not be suppressed.

It is beyond dispute that a burning building creates an exigency that justifies a warrantless entry by firefighters. *Michigan* v. *Tyler*, 436 U.S. 499, 509 (1978). It is also settled that officials do not need a warrant to remain in a building for a reasonable time to investigate the cause of a fire after it has been extinguished. *Id.* at 510.[4] "[O]nce in the building, offi-

---

[4]It was suggested in *Michigan* v. *Clifford*, 464 U.S. 287, 292 (1984), that if the damage to a home is "devastating," there may remain no reasonable expectation of privacy "in the ash and ruins." The damage to the defendants' home, although serious, was not sufficient to vitiate their expectation of privacy in the premises. Although unsafe, the home was still standing and personal effects remained inside the structure. See *Michigan* v. *Tyler*, 436 U.S. 499, 505 (1978) (where private effects remain in home damaged by fire, owners generally retain reasonable expectation of privacy in home).

cials need no warrant to *remain* for 'a reasonable time to investigate the cause of a blaze after it has been extinguished' " (footnote omitted; emphasis in original). *Michigan* v. *Clifford*, 464 U.S. 287, 293 (1984), quoting *Michigan* v. *Tyler*, *supra*.

The decisions in *Clifford* and *Tyler* grant fire officials some leeway with respect to an initial inspection, so long as the inspection is aimed at determining the cause and origin of a fire.[5] General Laws c. 148, § 2 (1992 ed.), requires that "[h]eads of fire departments in cities, towns or fire districts shall investigate the cause and circumstances of every fire or explosion in their respective jurisdictions by which property has been destroyed or damaged, especially to ascertain whether it was caused by carelessness or design." In *Tyler*, the United States Supreme Court upheld a warrantless search by officials attempting to determine the cause and origin of a fire. Hampered by darkness, steam, and smoke, they had left the scene of the fire at 4 A.M., and reentered after daybreak to continue their investigation. *Michigan* v. *Tyler*, *supra* at 511. In *Clifford*, where officials reentered a single-family home some five to six hours after the fire had been completely extinguished, a majority of the United States Supreme Court concluded that their warrantless entry constituted a violation of the homeowners' constitutional rights. In a concurring opinion filed in *Clifford*, however, it was observed that there was unanimous agreement among the Justices that firefighters who enter a home to fight a fire may remain on the premises without a warrant "while they continue to investigate the cause of the fire." *Michigan* v. *Clifford*, *supra* at 299-300 (Stevens, J., concurring). We think the following considerations are significant in this case. In contrast to the situation in *Clifford*, Viera arrived at the scene before the fire was extinguished and remained there for the remainder of the night and into the next morning, when

---

[5]In *State* v. *Grant*, 67 Ohio St. 3d 465, 470 (1993), cert. denied, 115 S. Ct. 116 (1994), the Supreme Court of Ohio observed that "[a]lmost uniformly, courts have sustained warrantless searches into the cause of fires conducted within a few hours of fire fighters' leaving the scene."

the search was conducted.[6] Other firefighters also remained
on the premises. Overhaul operations, which included
preventing a rekindling of the fire, continued throughout the
morning. The entry into the home around 8:20 A.M. was con-
ducted in conjunction with the overhaul operations. The fact
that Viera was joined by other officials who had not partici-
pated in fighting the fire does not have significance in a con-
stitutional sense. See *State* v. *Grant*, 67 Ohio St. 3d 463,
470-471 (1993), cert. denied, 115 S. Ct. 116 (1994). See also
*Michigan* v. *Clifford, supra* at 300 n.2 (Stevens, J., concur-
ring). Because of darkness, the presence of firefighters, and
the apparent extent of the damage, there would have been
scant opportunity before daybreak to conduct an initial in-
vestigation into the cause of a fire which had produced obvi-
ous signs of structural damage to the home.[7] See *State* v.
*Hoffman*, 567 A.2d 1134, 1137 (R.I. 1990) (citing *Tyler* and
holding that legitimate concerns about structural collapse
justified warrantless reentry for investigation into cause and
origin of fire in single-family home). Nothing in the record
suggests that fire officials had any clear notion of the cause
or origin of the fire prior to their initial investigation. Nor
does it appear that the scope of the initial investigation ex-
tended beyond a general survey of the premises calculated to
shed light on these questions. We conclude that Viera and
his companions were justified in entering the defendants'
home without a warrant on the morning of May 26, and that
evidence obtained during this entry should not be suppressed.
See *Commonwealth* v. *Smith*, 511 Pa. 36, cert. denied, 479
U.S. 1006 (1986) (upholding warrantless morning reentry
into single-family home where fire officials sought to deter-
mine cause and origin of fire).

[6]It was observed in *Clifford* that firefighters do not normally remain
within a building while they are fighting a fire. "Thus, the effort to ascer-
tain the cause of a fire may extend over a period of time with entry and
reentry." *Michigan* v. *Clifford, supra* at 293 n.3.

[7]Viera testified that the kitchen floor was sagging visibly on May 26. By
May 29, the chimney had collapsed, destroying access to the second floor
of the structure.

2. *Second search.* The defendants contend that the judge erred in refusing to suppress evidence gathered during the search conducted May 28 pursuant to an administrative warrant. The defendants argue that a criminal search warrant supported by full probable cause was necessary to conduct the search because its purpose was to seize evidence to be used in a criminal prosecution. Alternatively, the defendants argue that, even if a criminal search warrant was not necessary, the administrative warrant was invalid because it lacked sufficient particularity. We agree with the latter contention.

As has been previously mentioned, local fire officials are required by G. L. c. 148, § 2, to investigate the cause and circumstances of any fire in their city, town or district. The *Tyler* and *Clifford* opinions acknowledge that "determining the cause and origin of a fire serves a compelling public interest." *Michigan* v. *Clifford, supra* at 293. Accordingly, an investigator seeking to determine the cause and origin of a fire may enter a fire-damaged building on the basis of an administrative warrant issued on a showing "that a fire of undetermined origin has occurred on the premises." *Id.* at 294.[8] When the investigators left the defendants' home after the first search, they had determined that the fire originated in the general area of the basement, which remained submerged under four feet of water. It appeared that the fire had two points of origin. Although at least one of the investi-

---

[8]In *Tyler,* a majority of the Justices agreed that an administrative warrant was required for entry into a fire-damaged building after the exigency connected with the fire had dissipated. In *Clifford,* however, a divided Court cast doubt on this rule. A commentator has observed that after the plurality decision in *Michigan* v. *Clifford, supra,* it appears "that a majority of the Supreme Court is of the view that no warrant is required for a with-notice post-fire inspection into the cause of a fire." W.R. LaFave, Search and Seizure § 10.4(c), at 703 (2d ed. 1987). The Commonwealth has not argued that searches subsequent to the one which occurred on May 26 could be made without an administrative warrant. We assume, therefore, that an administrative warrant, at a minimum, was required, and that such a warrant was obtainable under the general provisions of G. L. c. 148, §§ 2 et seq., even though that statute does not expressly authorize or require a warrant.

gators had formed a suspicion of arson, the exact origin and the causes of the fire remained unknown. In these circumstances, the investigators did not require a criminal search warrant to enter the defendants' home. Entry was permissible on the showing required to obtain an administrative warrant.

We turn now to the validity of the administrative warrant involved in this case and the search conducted pursuant to it. To obtain an administrative warrant, in addition to showing that a fire of undetermined origin has occurred, officials must show "that the scope of the proposed search is reasonable and will not intrude unnecessarily on the fire victim's privacy, and that the search will be conducted at a reasonable and convenient time." *Michigan* v. *Clifford*, *supra* at 294. The proper scope of an administrative warrant issued to conduct an investigation pursuant to G. L. c. 148, § 2, is limited by the purpose for which the warrant is sought (to determine the cause and circumstances of a fire), see *Commonwealth* v. *Frodyma*, 386 Mass. 434, 438 (1982), and any warrant that is issued should limit the search in keeping with that purpose. See *Commonwealth* v. *Accaputo*, 380 Mass. 435, 441 (1980) (lesser standard of probable cause required to obtain administrative search warrant linked to limited scope of administrative search).

After their first search of the defendants' home, the investigators had concluded that the fire had originated in the basement.[9] Nevertheless, the affidavit in support of the administrative warrant described the area to be searched as "the entire structure." A search of such a broad scope was unreasonable and unwarranted as an administrative search. Because the investigators had concluded, prior to their application for the administrative warrant, that the fire had originated in the basement, their application and the resulting warrant should have been limited to that area. "An ad-

---

[9]At the hearing on the defendants' motion to suppress, Chief Viera testified that, by 10:30 A.M. on May 26, the investigators had concluded "that the fire had started in the basement definitely."

ministrative search into the cause of a recent fire does not give fire officials license to roam freely through the fire victim's private residence." *Michigan* v. *Clifford, supra* at 298. The investigators could have used whatever evidence they discovered in the basement to establish probable cause to search the remainder of the house. *Id.* In the absence of exigent circumstances or consent, however, a criminal search warrant was necessary to conduct an expansive search. Because its undue breadth invalidated the administrative warrant, evidence discovered by officials during the search conducted pursuant to the warrant must be suppressed. See *Commonwealth* v. *Frodyma, supra* at 434.[10]

3. *Third search.* The Commonwealth asserts that the motion judge erred in suppressing the evidence gathered by the insurance investigator because the search did not involve State action sufficient to trigger the protections of the Fourth Amendment. We conclude that the evidence before the judge was not sufficient for a decision on this point, and we remand this matter for consideration of additional evidence.

The Fourth Amendment's prohibition against unreasonable search and seizure does not extend to a search or seizure conducted by a private party. See *Burdeau* v. *McDowell,* 256 U.S. 465, 475 (1921). The protection of the Fourth Amendment is fully applicable, however, to a search or seizure by a private party acting as an agent of the State. *Coolidge* v. *New Hampshire,* 403 U.S. 443, 487 (1971). A private party becomes a State agent when government officials have instigated the party to search or participated with the party in a search in which they could not themselves have legally engaged. See *Commonwealth* v. *Leone,* 386 Mass. 329, 333

---

[10]Despite the defendants' argument to the contrary, a preprinted form application for a postfire administrative warrant can satisfy the particularity requirements of the Fourth Amendment. In the application used in this case, there was space provided to describe the premises to be searched. There was no reason why the portion of the premises to be searched could not have been described with greater specificity. See note 2, *supra.* See also *Commonwealth* v. *Frodyma,* 386 Mass. 434, 448 (1982).

(1982); *Commonwealth* v. *Richmond*, 379 Mass. 557, 561-562 (1980).

In allowing suppression, the judge relied on the fact that personnel from the fire and police departments provided access to the home to Calenda and that Viera allowed Calenda the use of a ladder truck for a visual inspection of the second floor, which was no longer accessible by the stairs. Allowing access was not a significant contribution to Calenda's search if, as is likely, he had a consensual right to enter the home based on the terms of the insurance contract between Degregorio and Cambridge Mutual Insurance Company. Nor would fire officials' presence on the scene, coupled with the use of the ladder truck for a visual inspection, necessarily establish "participation" in the investigation sufficient to establish State action. See *State* v. *Grant, supra* at 471 (fire officials' presence and provision of lighting for private insurance investigator characterized as "courtesy" not constituting State action).. Additional inquiry is needed to ascertain the circumstances under which the police and fire officials gave assistance to Calenda, the extent of the assistance, and what resulted from it in terms of aid to the investigation. We conclude, therefore, that there must be further findings as to the cooperation and involvement of police and fire officials with Calenda on May 29, if the Commonwealth desires to rely on information obtained by Calenda at trial. See *Commonwealth* v. *John G. Grant & Sons Co.*, 403 Mass. 151, 161 (1988).[11]

4. *The defendants' statements.* Finally, the defendants argue that all statements made by Jung in his interview with Detective Brennan on May 28, prior to being advised of his Miranda rights, and all statements made by Degregorio, who was never given her Miranda warnings, should be suppressed

---

[11]To the extent that Calenda's information reflects evidence gathered by government officials on May 28, pursuant to the administrative warrant that has been ruled violative of the defendants' Fourth Amendment rights, that part of the information may in no event be offered at trial. Evidence illegally obtained may not be cleansed of its taint by inclusion in a document that may otherwise be admissible.

because they were obtained in violation of their Fifth Amendment rights against self-incrimination. See *Miranda* v. *Arizona*, 384 U.S. 436, 444 (1966). We agree with the motion judge, however, that Miranda warnings were not required because the interrogations of the defendants were not custodial in nature.

Miranda warnings are only necessary for "custodial interrogations." *Id.* See *Commonwealth* v. *Haas*, 373 Mass. 545, 551 (1977), *S.C.*, 398 Mass. 806 (1986). "By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda* v. *Arizona, supra* at 444. We have recognized that four factors in particular are helpful in determining whether an individual's freedom of action is sufficiently curtailed so as to require Miranda warnings: "(1) the place of the interrogation; (2) whether the investigation has begun to focus on the suspect, including whether there is probable cause to arrest the suspect; (3) the nature of the interrogation, including whether the interview was aggressive or, instead, informal and influenced in its contours by the suspect; and (4) whether, at the time the incriminating statement was made, the suspect was free to end the interview by leaving the locus of the interrogation or by asking the interrogator to leave, as evidenced by whether the interview terminated with the defendant's arrest." *Commonwealth* v. *Bryant*, 390 Mass. 729, 737 (1984).

The defendants' contention that they were in custody at the time of their respective interrogations has some support in the record. The defendants were interviewed separately and at a time when the investigation was focused solely on them. The interviews, however, were not conducted in an aggressive manner or in a coercive environment. The defendants went to the police station voluntarily and were free to leave or otherwise terminate the interrogation at any time. Jung, in fact, did terminate the interview when he became uncomfortable with the tenor of the questions. Neither interview terminated with an arrest. "[P]olice officers are not re-

quired to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.' It was *that* sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited" (emphasis in original). *Oregon* v. *Mathiason*, 429 U.S. 492, 495 (1977). The judge did not err in declining to suppress the defendants' statements to police.

5. *Disposition.* The order entered on December 28, 1993, on the defendants' motion to suppress is vacated. Further consideration of the motion is to be made as directed in part 3 above, and a new order thereafter entered on the motion in accordance with this opinion.

*So ordered.*