COMMONWEALTH vs. WILLIAM J. DOYLE.

Hampshire.  November 6, 1981. — December 17, 1981.

Present: HALE, C.J., GRANT, & GREANEY, JJ.

*Motor Vehicle*, Homicide, Operation.  *Evidence*, Admissions and confessions.  *Constitutional Law*, Admissions and confessions.

At the trial of complaints charging vehicular homicide and operation of a motor vehicle after revocation of a license, evidence of the circumstances in which the defendant was found at the scene of an accident and of several inconsistent statements made by the defendant to explain his presence at the scene warranted a conclusion that the defendant had been the operator of the automobile that had crashed. [787-789]

At the trial of complaints charging vehicular homicide and operation of a motor vehicle after revocation of a license, there was no error in the denial of the defendant's motion to suppress certain statements made by him after the accident. [789-795]

COMPLAINTS received and sworn to in the Hampshire Division of the District Court Department on January 29, 1980.

The cases were tried before *Porada, J.*

*Edward N. Hurley* for the defendant.

*Stephen R. Kaplan*, Assistant District Attorney (*Charlotte Guyer*, Special Assistant District Attorney, with him) for the Commonwealth.

GREANEY, J.  Doyle was convicted by a jury in a District Court on charges of vehicular homicide (G. L. c. 90, § 24G),[1] and operating after revocation of his license (G. L. c. 90, § 23).  On appeal, Doyle contends (1) that his motions

---

[1] This complaint was framed under the portion of § 24G which punishes homicide by motor vehicle occurring when the driver of the vehicle is under the influence of intoxicating liquor.

for required findings of not guilty on both charges were improperly denied and (2) that certain oral statements made to law enforcement officers should have been suppressed because they were obtained in violation of his rights under *Miranda* v. *Arizona*, 384 U.S. 436 (1966). We affirm the convictions.

1. By his motions for required findings of not guilty, Doyle challenged only the sufficiency of the Commonwealth's evidence to prove that he was the driver of the automobile which, on January 29, 1980, at approximately 12:45 A.M., crashed and burned on Park Street in South Hadley near the campus of Mount Holyoke College. As a result of the accident, a second man in the car, William J. Sibley, incurred injuries which proved fatal.

The evidence, viewed in the light most favorable to the Commonwealth, is as follows. Doyle and Sibley had been seen together leaving a bar in South Hadley shortly before midnight. Sibley's car was still parked outside the bar when it closed at 2:00 A.M. A security guard at Mount Holyoke College saw in a window the reflection of a car traveling on Park Street and, within seconds, heard a crash. The guard arrived at the scene of the accident moments later. He observed the car stopped next to a bridge abutment with its headlights pointed directly into the flow of traffic. The passenger side of the vehicle was severely damaged; the passenger door itself was inoperable. Sibley, an obese man, was sprawled across the two bucket seats and center console with his head hanging out of the open door on the driver's side. Doyle was attempting to pull Sibley from the wrecked vehicle which, by then, had begun to burn. Doyle's attempt at extricating Sibley was complicated by the latter's immense bulk, by the configuration of the front bucket seats separated by a raised console in the center, and by the fact that Sibley's foot was pinned below the dashboard on the passenger's side. Doyle was heard to say to the decedent, "John, you are going to be okay. I am going to get some help for you, you are not hurt too bad."

Two officers of the South Hadley police force arrived at the scene within minutes after the accident. They observed that the vehicle's right fender and side were crushed, but that the door on the driver's side could be opened. Their immediate attention was directed to obtaining emergency medical assistance for Sibley. A third officer who examined the scene later testified that the impact of the crash had crushed the front floorboard together and that he had found the charred remains of a man's shoe on the floor on the passenger side. Sibley, who was subsequently pronounced dead on arrival at the hospital, had charring on both lower legs and the left heel. A Registry inspector, who also examined the scene before the wreckage of the car was towed, expressed the opinion that the vehicle struck the southerly portion of the bridge abutment at high speed, spun around in a clockwise direction, and then came to rest facing traffic.

After the accident, Doyle made several inconsistent statements as to how he had come to be at the scene. He first claimed that he had been picked up by the driver of the car while hitchhiking. He later stated that he had been walking on the street when he saw the car hit the bridge. In addition, Doyle went to a hospital in Greenfield the next day and told hospital personnel that he had been "involved in an automobile accident the night before." On the night of the accident, Doyle denied knowing Sibley, and the police were unable to find any identification on the decedent. Later that night, the police officers who had been talking with and observing Doyle formed the opinion that he was under the influence of alcohol. The Commonwealth did not introduce evidence as to the registration or ownership of the vehicle.

The evidence which placed Doyle and Sibley together leaving a bar, and which placed them both at the scene moments after the accident, warrants a finding that the two men were in the car when it hit the bridge abutment. It could also be inferred that Doyle was the driver, that Sibley was the passenger, and that Doyle had not changed his place in the car following the accident. These inferences

could properly have been drawn from the evidence which indicated that the door on the passenger side could not be opened, while the door on the driver's side could, which depicted the configuration of the front seats, and which described Sibley's position in the front seat when Doyle was attempting to extricate him. The fact that Sibley's charred foot was pinned in the wreckage on the passenger's side where a police officer later found the remains of a burned shoe tends to corroborate these inferences. Additionally, Doyle's claim that Sibley was a stranger to him, and his evasive and conflicting statements as to how he came to be at the scene, could have been taken as attempts to mislead the police and escape responsibility. As such, the statements could have been found to manifest consciousness of guilt. See *Commonwealth* v. *LaFrance*, 361 Mass. 53, 56 (1972). Viewed as a whole, the evidence permitted the jury to conclude with the degree of conviction required by *Commonwealth* v. *Latimore*, 378 Mass. 671, 677-678 (1979), that Doyle was the driver of the car. Contrast *Commonwealth* v. *Mullen*, 3 Mass. App. Ct. 25, 26-27 (1975). Since the other elements of the offenses were not questioned, the motions for directed findings of not guilty were properly denied.

2. We summarize the facts material to the motions to suppress. After the police left the scene, Doyle apparently went on his own to Holyoke Hospital, where Sibley had been taken. There he met Officers Labrie and Gaudreault of the South Hadley police force. Doyle had lacerations on his face and appeared to be in shock. Doyle was asked if he wanted medical treatment but responded that he felt fine, and that he did not. Because of the gravity of Sibley's condition, there had been insufficient opportunity for the police at the scene to determine the circumstances of the accident or ascertain the identity of either Doyle or Sibley. At the hospital, in response to questions about the accident, Doyle told Officer Labrie that he did not know Sibley, that he had been picked up while hitchhiking, and that he did not know where he was coming from or where he was going

because he had been "drinking" and was "fucked up." Doyle thereafter identified himself at Labrie's request through the production of a firearms identification card. Officer Labrie then left to see if he could find some identification on Sibley, who was still unidentified. Upon being informed by the officer that Sibley had no identification with him and that Doyle was the only link to what had happened, Doyle was asked to come to the police station with the officers and was told that the person he (Doyle) had called to pick him up would be directed there by the hospital staff. Doyle replied, "Fine." Doyle was in the presence of the officers at the hospital for about forty-five minutes.

Apparently for convenience, Doyle and two police officers went to the station in the back of the ambulance. During the ten-minute trip to the station, Doyle told the officers in response to further questioning that he had dropped his girlfriend off at a Mount Holyoke College dormitory, and that he was walking down Park Street when he saw the accident. He said that he had not revealed this information before because he was married and did not want his wife to learn about his girlfriend.

Doyle arrived at the police station at about 2:00 A.M. The officer manning the desk knew of the accident and believed (because of Doyle's facial lacerations and two other officers acting as his escort) that Doyle was a suspect. As a result, the desk officer immediately furnished Doyle with Miranda warnings. He then asked Doyle his name and requested some identification. Doyle responded by stating his name and calling the officers "a bunch of pigs." When asked by the desk officer if he knew the other man in the car, Doyle next replied that he had never met him, and added, "You guys are trying to pin it on me." Doyle thereafter took a seat outside the booking desk in the corridor. He was not handcuffed, placed under arrest, searched, or placed in custody, although the desk officer later testified that Doyle would not have been allowed to leave the station until he answered "a few questions." Sometime shortly after 2:00 A.M., a Registry inspector assigned to investigate the accident

came to the station. As the inspector approached the book-
ing desk, Doyle, who was standing outside, said, "Why do
we have a Registry pig? You've already pulled my ticket."
The inspector thereafter left for the hospital and did not
return to the station until after Doyle's arrest.

Sometime between 2:10 and 2:40 A.M., Officer Gill, the
officer in charge of the investigation, returned to the station
from the scene. Officer Gill still did not know Sibley's iden-
tity so he again asked if Doyle could help in the determina-
tion. Doyle responded that he did not "know anything,"
that he felt that the police were "picking on" him, that he
did not "need to get . . . involved in this" because his wife
was pregnant, and that he had only been with his girlfriend
at a college dormitory "which [was] adjacent to the area of
the accident." In response to these statements, Officer Gill
told Doyle that the police were just trying to determine who
the decedent was, and that they would appreciate his help if
he knew. Doyle then asked the officer if he was free to go.
The officer informed Doyle that he was not being charged
and that he could leave the station if he wished. Subsequent
to this conversation, Doyle made a telephone call to an at-
torney.

At approximately 2:40 A.M., the bartender who had served
Doyle and Sibley came to the station. He stated that he had
known Doyle and Sibley for some time, that they had left
the bar together, and that Sibley's car had been left behind.
Based on this information, Officer Gill placed Doyle under
arrest at 2:48 A.M., had him booked, advised him again of
his Miranda rights, and charged him with the instant of-
fenses.

The judge concluded that, despite Doyle's facial injuries
and some evidence that he had been drinking, he was in
control of his faculties throughout the night, and was able
to respond rationally and intelligently to all the questions
asked by the police. She found that Doyle had gone to the
hospital on his own and that he had accompanied the offi-
cers to the police station voluntarily. She also found that
the questions asked by the officers at the hospital and enroute

to the station were in "the nature of preliminary investiga-
tion" of a fatal automobile accident directed at ascertaining
the identity of both Doyle and the deceased in circumstances
where "[t]he investigation had not yet focused upon the de-
fendant as a suspect for violation of any law." As to the
events at the station, the judge found that Doyle's remarks
about the Registry inspector were uttered spontaneously
when the defendant saw the inspector enter the police sta-
tion in uniform. She concluded that, prior to Doyle's ar-
rest, the police were still endeavoring to identify Sibley and
to determine who had been driving the car. She also con-
cluded that Doyle's freedom of action at the police station
had not been "curtailed in any significant respect" and that
his statements made there were "not the product of
custodial interrogation but [rather] the product of a series of
preliminary questions into the police's ongoing investigation
of an automobile accident." We are in agreement with the
judge's conclusions as to the statements made prior to
Doyle's arrival at the police station. We also conclude that
the statements made at the station were admissible,
although our reasoning differs from that of the judge.

Miranda warnings are required when a person is subject-
ed to "custodial interrogation," i.e. "questioning initiated
by law enforcement officers after a person has been taken
into custody or otherwise deprived of his freedom of action
in any significant way." *Miranda* v. *Arizona*, 384 U.S. at
444. The warnings are not required for "[g]eneral on-the-
scene questioning as to facts surrounding a crime or other
general questioning of citizens in the fact-finding process."
*Id.* at 477. Drawing the line between custodial interroga-
tion and general investigative questioning has not been an
easy task for the courts, but some guidance was provided in
*Oregon* v. *Mathiason*, 429 U.S. 492, 495 (1977), as follows:
"Any interview of one suspected of a crime by a police offi-
cer will have coercive aspects to it, simply by virtue of the
fact that the police officer is part of a law enforcement sys-
tem which may ultimately cause the suspect to be charged
with a crime. But police officers are not required to admin-

ister *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.' It was *that* sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited." (Emphasis original.) Within this framework, the applicability of *Miranda* to a particular case must be determined after an objective review of all the circumstances, with consideration given to such factors as the nature of the crime, the place where the questioning takes place (*Commonwealth* v. *Haas*, 373 Mass. 545, 552 [1977]), the status of the investigation at the time of the questioning, the conduct of the police toward the defendant, the defendant's reasonable belief as to his freedom of action (*United States* v. *Montos*, 421 F.2d 215, 223 [5th Cir.], cert. denied, 397 U.S. 1022 [1970]), and the ability of the defendant voluntarily to leave the place of questioning. *Commonwealth* v. *Cruz*, 373 Mass. 676, 683 (1977), and cases cited.

Our scrutiny of the facts presented at the hearing satisfies us that the judge could properly conclude that the questions posed to Doyle prior to his arrival at the station were general in nature, that they were "directed to discovering . . . what he knew about the circumstances" of the accident (*Commonwealth* v. *Borodine*, 371 Mass. 1, 4-5 [1976], cert. denied, 429 U.S. 1049 [1977]), and that he was not "in custody" when the questions were asked. The officers at the scene were confronted with a serious one-car accident, and their first priority was to obtain immediate medical attention for Sibley. They made no attempt to detain Doyle at the scene. When he later appeared at the hospital, the officers did not know his identity or Sibley's, and their inquiries were directed at ascertaining how Doyle came to be at the scene and whether he had been in the car. The case at that point was still one which the police were investigating to obtain facts which would allow them "to exercise reasoned

and informed judgment . . . in determining whether a violation ha[d] occurred." *Commonwealth* v. *Pappas*, 384 Mass. 428, 432-433 (1981). The evidence warrants the judge's findings that Doyle accompanied the officers to the station voluntarily and that the questions asked during the brief ambulance ride were designed to obtain preliminary investigative information. See *Commonwealth* v. *Cruz*, *supra* at 682-683, and cases cited.

The questioning at the station stands on a different footing. Doyle's comments to the desk officer followed Miranda warnings given by that officer and were in response to relatively routine identification questions. Doyle's subsequent remarks about the Registry inspector were entirely extemporaneous and were not made in response to any police questioning. As such, they would fall outside of the scope of the Miranda rule, which is confined to the constitutional propriety of remarks elicited as a result of police questioning.

The final period of questioning at the station by Officer Gill also occurred within twenty to thirty minutes of Doyle's receipt of Miranda warnings and pertained to the same subjects that had been discussed earlier. No question was raised below (and none has been raised here) with respect to the content of the warnings or (except as discussed in part 3, *infra*) with respect to whether Doyle understood them and comprehended their significance. We think the record sufficiently supports the conclusion that the Miranda requirements were satisfied immediately upon Doyle's arrival at the station and that his subsequent answers to Officer Gill's questions were based upon his voluntary relinquishment of his rights.[2] We note as well that the information furnished

---

[2] There is no serious contention that the approximately two-hour period in which Doyle was in the presence of the police affects the outcome of the case. Such a "quantitative approach [would] ignore[] the fundamental inquiry mandated by *Miranda* — whether the person is placed in a coercive environment which restricts his freedom so as 'to render him "in custody".' . . a scenario which can develop in a matter of moments, see *Orozco* v. *Texas*, 394 U.S. 324, 325 . . . (1969), or not materialize over a three hour period of questioning, see *Beckwith* v. *United States*, 425 U.S. 341, 342-343 . . . (1976)." *Borodine* v. *Douzanis*, 592 F.2d 1202, 1208 (1st Cir. 1979).

Commonwealth v. Doyle.

to Officer Gill basically restated what Doyle had previously told the other officers. As a result, we need not address the issue whether Doyle was "in custody" during the last period of questioning because of the desk officer's inclination not to let him go until he answered "a few questions" (but see *Commonwealth* v. *Podlaski*, 377 Mass. 339, 342-343 [1979]), or whether the restraints on his liberty could be found to be "insignificant" in view of Officer Gill's testimony that he had no basis on which to charge Doyle and that he informed him that he was free to leave after his final questions were asked and answered.[3] See *United States* v. *Hall*, 421 F.2d 540, 545 (2d Cir. 1969), cert. denied 397 U.S. 990 (1970); *Borodine* v. *Douzanis*, 592 F.2d 1202, 1208 (1st Cir. 1979). See also *United States* v. *Stanley*, 597 F.2d 866, 869 (4th Cir. 1979) (defendant's subjective feeling that he was in custody during questioning not controlling if evidence reveals that his freedom was unrestricted). Contrast *Commonwealth* v. *Cruz, supra* at 682-684.

3. Doyle's last contention seems to be that because of his intoxicated condition he could not have intelligently waived his rights under *Miranda* knowingly and voluntarily after they were given by the desk officer and that as a result any statements made subsequent to the warnings should have been suppressed. We find no basis in the record for rejecting the judge's implicit conclusions that, despite being under the influence of alcohol, Doyle retained adequate capacity to understand the warnings given him, to intelligently waive them, and to understand the officers' inquiries. This is not a case where the police questioned a defendant who was obviously and seriously disabled by reason of intoxication.

---

[3] The record has been reviewed with regard to the attitude owed by the reviewing court to the trial judge who rules on a motion to suppress, that it is for that judge to resolve questions of credibility; that her subsidiary findings are to be respected if supported by the evidence; that her findings of ultimate facts deriving from the subsidiary findings are open to reexamination by this court, as are her conclusions of law, but, even so, that her conclusions are entitled to deference. See *Commonwealth* v. *White*, 374 Mass. 132, 137-138 (1977), aff'd 439 U.S. 280 (1978); *Commonwealth* v. *Tabor*, 376 Mass. 811, 822 (1978), and cases cited.

Contrast *Commonwealth* v. *Hosey*, 368 Mass. 571, 575-579 (1975). Rather, the case depicts a situation where drinking has caused a defendant to make remarks which he might, after sober reflection, regret, but which nevertheless are admissible at trial on the issue of guilt. *Commonwealth* v. *Doyle*, 377 Mass. 132, 137-138 (1979), and cases cited.

*Judgments affirmed.*