COMMONWEALTH *vs.* PATRICK MORSE.

Norfolk. January 5, 1998. - March 20, 1998.

Present: WILKINS, C.J., ABRAMS, LYNCH, GREANEY, FRIED, MARSHALL, & IRELAND, JJ.

*Evidence,* Admissions and confessions, Voluntariness of statement. *Constitutional Law,* Admissions and confessions, Waiver of constitutional rights. *Practice, Criminal,* Admissions and confessions, Voluntariness of statement, Waiver. *Waiver.*

In a criminal case, the record of a hearing on a motion to suppress the defendant's statements did not support the defendant's contention that he was in custody at the time he made a certain incriminating statement to police before he was advised of his Miranda rights, either from an objective view of the circumstances or from the view of a reasonable person in the defendant's position; further, the record supported the judge's conclusion that the defendant thereafter made a valid waiver of those rights before making further statements to police. [122-128]

, INDICTMENTS found and returned in the Superior Court Department on July 13, 1995.

A pretrial motion to suppress evidence was heard by *Judith A. Cowin,* J.

An application for leave to prosecute an interlocutory appeal was allowed by *Greaney,* J., in the Supreme Judicial Court for the county of Suffolk, and the appeal was reported by him.

*Robert C. Cosgrove,* Assistant District Attorney, for the Commonwealth.

*Kevin J. Reddington* (*Lee Garrison* with him) for the defendant.

GREANEY, J. The Commonwealth appeals from an order entered in the Superior Court suppressing statements made by the defendant, Patrick Morse, to law enforcement officers on June 25, 1995. The defendant has been indicted for murder in the first degree and other crimes allegedly arising from events that occurred in Avon on June 23, 1995.

After an evidentiary hearing, a judge entered a memorandum of decision and order in which she ruled that (1) the police

failed to give the defendant timely Miranda warnings, (2) incriminating statements made by the defendant prior to his receipt of Miranda warnings were inadmissible, and (3) statements made by the defendant after he had received Miranda warnings were tainted by the earlier interrogation, and thus also inadmissible. A single justice of this court allowed the Commonwealth's application to pursue an interlocutory appeal. See Mass. R. Crim. P. 15 (b) (2), as amended, 397 Mass. 1226 (1986). For the reasons next discussed, we reverse that portion of the order that is the subject of the Commonwealth's appeal.

1. We summarize the facts as found by the judge, all of which are supported by the evidence, and which we accept. *Commonwealth* v. *Jung*, 420 Mass. 675, 681 (1995). *Commonwealth* v. *Costa*, 414 Mass. 618, 626 (1993). In the early morning hours of Friday, June 23, 1995, Philip Miskinis, approximately sixty-five years old, was murdered in his Avon home. The cause of death was multiple stab wounds (twenty-seven). State police officers assigned to the Norfolk County district attorney's office were interested from the onset of the murder investigation in locating one Michael Freeman. Miskinis had suspected that Freeman had broken into his home a year earlier and stolen a weapon.

On the afternoon of June 24, 1995, after learning that Anna Kaudy was a friend of Freeman, State police Sergeant Kevin Shea went to interview her at her home. Shea told Kaudy that he was investigating a murder and that the police wanted to talk to her companion, Leonard Stanley. The defendant telephoned Kaudy at approximately 4:30 P.M., while she was speaking with Shea. Aware that the defendant was a friend of Freeman, Shea asked to speak with him. Shea told the defendant that he was investigating the murder of an elderly man in Avon and asked the defendant if he could come to the Avon police station to talk with the police. Although the defendant expressed reluctance, telling Shea that his automobile did not have enough gas for him to travel from his home in Middleborough to Avon, he ultimately agreed to meet in Avon after Shea had suggested meeting in Middleborough. The defendant asked Shea if Kaudy could accompany him, and Shea responded that she could. Shea left Kaudy's house shortly thereafter.

At approximately 7 P.M., the defendant and Kaudy arrived at the Avon police station. Kaudy was interviewed in one room by two officers, one of whom was Shea, and the defendant was

interviewed in a separate room by two other officers, one of whom was Trooper Brian L. Howe.

a. *The first (Howe) interview.* The defendant's interview room was small, measuring approximately twelve feet by twenty feet, with windows, and containing tables and chairs. During the interview, the defendant was seated in a chair approximately six feet from Howe. He was asked questions by the officers, and he also spoke in narrative form. The defendant was not given Miranda warnings at this time.

Howe told the defendant that the police were interested in his activities on Thursday, June 22, 1995, and that they were looking for Freeman. The defendant responded that after completing work at approximately noon on that day, he had gone to the Brockton home of Amy McCormack, where he met Stanley and Freeman, with whom he spent the remainder of the day. The defendant stated that he left McCormack's house, alone, at approximately 10 P.M., and drove to Middleborough where he met "Chris, Joe and a Jamaican," with whom he traveled to Manomet Beach in Plymouth, arriving at approximately 11:30 P.M. He was unable to provide last names for Chris and Joe, or a name for the individual he described as a "Jamaican." The defendant said that after spending the night in his vehicle on the beach, while the three others slept outside, he woke at approximately noon the following day, returned to Brockton, and when he could not locate his friends, drove home to Middleborough. He returned to McCormack's house between 6 and 7 P.M., where he met Stanley and Freeman, and the three then proceeded to Borderland State Park with seven other individuals where they stayed until midnight, after which the defendant returned to McCormack's house. The defendant was asked whether Stanley carried a knife and he responded that he did, and that the last time he saw Stanley with the knife was four or five days earlier. The defendant also described the clothing Freeman and Stanley were wearing on Thursday.

Shea joined the interview at approximately 7:30 P.M., and, in response to Howe's request, the defendant repeated his story to Shea. After hearing the defendant's version of events, Shea told him that Kaudy had recalled that on Thursday night he had left McCormack's house together with Stanley and Freeman. The defendant responded that, while the three may have left together, "they went their way and I went my way." Shea then left the interview room.

Commonwealth *v.* Morse.

b. *The second (Shea) interview.* On leaving the defendant's interview room, Shea returned to speak with Kaudy who said that she was sure that the three had left McCormack's house together, and that they stated at the time that they were going to Bickford's Pancake House. She also told Shea that Stanley carried a "Gerber" knife, Freeman carried a knife, and the defendant had a toolbox in his vehicle.

Shea then returned to speak with the defendant.[1] On entering the room, Shea told the defendant what Kaudy had told him. The defendant "hung his head and stared at the floor." This indicated to Shea that the defendant "wanted to get something off his chest, tell us something." Howe then left the interview room. Shea told the defendant that it was "imperative that he be truthful . . . because of the seriousness of the crime." The defendant responded that he had given Freeman and Stanley a ride to a Veterans of Foreign Wars Post near Route 24 in an area off Harrison Boulevard in Avon. Freeman and Stanley had told the defendant that they were planning "to do a b & e [breaking and entering] on some old guy's house." Shea told the defendant that he would like to hear the whole story and the defendant agreed to tell him. At this point, which was approximately forty-five minutes after the defendant arrived at the police station, Shea advised the defendant of his Miranda rights.

Thereafter, the defendant made further statements to Shea, some of which were incriminating. When the forty-five minute interview was completed, Shea asked the defendant if he "would mind waiting around in case [the police] had any more questions." The defendant said "ok," left the interview room, and went to the front of the station with Kaudy to have a cigarette. The defendant was not accompanied by any police officer. He eventually went next door to the fire station and watched television. At some point, the time of which is unclear from the evidence, the defendant was told that his car could not leave the station.[2]

c. *The third (Flaherty) interview.* At approximately 2 A.M. on June 25, the defendant was interviewed by State police Sergeant

[1]The judge designated this point as the beginning of the second interview.

[2]When Trooper Howe left the interview room, he went outside the station to where the defendant had parked his automobile. Looking in through the front passenger side window, Howe noticed a dark discoloration on the seat belt which in his opinion was consistent with blood. It was Howe's observation that lead to the seizure of the automobile.

Joseph Flaherty. Shea was present at this interview. After the defendant was again advised of his Miranda rights, Flaherty told the defendant that he had information that the defendant, Freeman, and Stanley were involved in the robbery and murder of Miskinis, and Flaherty asked the defendant if he wanted to make a statement. The defendant agreed to do so, but first left the room to say good-bye to McCormack and Kaudy. The defendant then made additional statements, fully implicating himself, Freeman, and Stanley in the planning and execution of the robbery and the murder. At the conclusion of this interview, the defendant was placed under arrest.

The judge found that during all of the interviews, the defendant was rational and coherent, and responded to questions logically and appropriately. The atmosphere in the interviews was not threatening, and there was no indication that the questioning was anything but courteous and nonaggressive. The officers were in plainclothes, no weapons were apparent, and there was never a large number of officers present. The evidence did not suggest that the defendant was under the influence of any substance or that he did not understand the Miranda warnings when they were given.

d. *The judge's rulings.* The judge concluded that "the defendant's waiver of his rights each time was made knowingly, voluntarily and intelligently beyond a reasonable doubt."[3] After applying the analysis set forth in *Commonwealth* v. *Bryant*, 390 Mass. 729, 737 (1984),[4] the judge concluded that Miranda warnings were not necessary before or during the first interview.[5] She determined that Shea's statement to the defendant concern-

---

[3]The judge noted that the defendant had appeared to read two different Miranda warning cards and signed each one.

[4]In *Commonwealth* v. *Bryant*, 390 Mass. 729, 737 (1984), we set forth four indicia of custody, drawn from Federal law, including "(1) the place of the interrogation; (2) whether the investigation has begun to focus on the suspect, including whether there is probable cause to arrest the suspect; (3) the nature of the interrogation, including whether the interview was aggressive or, instead, informal and influenced in its contours by the suspect; and (4) whether, at the time the incriminating statement was made, the suspect was free to end the interview by leaving the locus of the interrogation or by asking the interrogator to leave, as evidenced by whether the interview terminated with the defendant's arrest."

[5]In particular, the judge determined that at the time of the interview, the investigation had not yet begun to focus on the defendant; the defendant had come to the police station voluntarily; there did not exist probable cause to arrest the defendant; the nature of the interrogation was informal and nonaggres-

ing the inconsistency between his and Kaudy's versions of events "was not designed to induce an incriminating response, but was merely intended to clarify what might have been a minor, explicable inconsistency."

Applying *Bryant* to the circumstances of the second interview, the judge concluded that, once Shea heard the defendant's story and realized that it was not consistent with Kaudy's, the defendant "should have been considered a suspect." Even if Shea did not consider the defendant a suspect when he learned of the inconsistency, the judge determined that the defendant "should have been considered a suspect once Shea rechecked with [Kaudy] her version of the events and [Kaudy] had emphasized that she was certain as to her account." The judge stated that "Miranda warnings should have been given at the very least after Shea rechecked the story with [Kaudy]." Accordingly, the judge ruled that the statement that the defendant made regarding giving Freeman and Stanley a ride to Route 24 where they were going to do a "b & e on some old guy's house," as well as the observations Shea made of the defendant's behavior at that time, were inadmissible. The judge further ruled that the later statements made by the defendant to Shea and Flaherty were presumptively tainted, and that this presumption was not overcome by the Commonwealth; accordingly, she suppressed those statements as well.

2. In reviewing the judge's decision, we "give[] substantial deference to the judge's ultimate findings and conclusions of law, but independently review[] the correctness of the judge's application of constitutional principles to the facts found." *Commonwealth* v. *Magee*, 423 Mass. 381, 384 (1996), quoting *Commonwealth* v. *Mello*, 420 Mass. 375, 381 n.8 (1995). See *Commonwealth* v. *Jung*, 420 Mass. 675, 681 (1995), quoting *Commonwealth* v. *Accaputo*, 380 Mass. 435, 448 n.18 (1980). The central issue of this appeal is whether the defendant timely was given Miranda warnings, which requires a determination whether he was in custody when he made the statement to Sergeant Shea about giving Freeman and Stanley a ride.

Miranda warnings are only necessary where one is subject to "custodial interrogation." *Commonwealth* v. *Jung, supra* at 688, quoting *Miranda* v. *Arizona*, 384 U.S. 436, 444 (1966). Custodial interrogation is "questioning initiated by law enforce-

---

sive; and the defendant, objectively, was free to end the interview by leaving the place of the interrogation.

ment officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.*, quoting *Miranda* v. *Arizona, supra.* "[T]he safeguards prescribed by *Miranda* become applicable as soon as a suspect's freedom of action is curtailed to a 'degree associated with formal arrest.' " *Berkemer* v. *McCarty,* 468 U.S. 420, 440 (1984), quoting *California* v. *Beheler,* 463 U.S. 1121, 1125 (1983). "To find custodial interrogation, the court must first examine all the circumstances surrounding the exchange between the government agent and the suspect, then determine from the perspective of a reasonable person in the suspect's shoes whether there was (1) a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest and (2) express questioning or its functional equivalent," *United States* v. *Ventura,* 85 F.3d 708, 712 (1st Cir. 1996), which includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 711, quoting *Rhode Island* v. *Innis,* 446 U.S. 291, 301 (1980). See *Commonwealth* v. *Sheriff,* 425 Mass. 186, 197 (1997); *Commonwealth* v. *Torres,* 424 Mass. 792, 796-797 (1997). Whether a suspect was subject to custodial interrogation is, in the circumstances here, a question of Federal constitutional law. Cf. *Commonwealth* v. *Snyder,* 413 Mass. 521, 531 (1992).

The judge's analysis of the custody issue centered on Sergeant Shea's beliefs regarding the defendant's status as a suspect. In reaching her conclusion, the judge noted the similarities between the second and the fourth *Bryant* factors, and distinguished the factors by surmising that the "key to [the second] factor . . . would appear to be whether the focus is on the suspect." The judge granted the defendant's motion to suppress principally because she concluded that, at the point Shea rechecked the defendant's story with Kaudy, the defendant should have been considered a suspect, and Shea should have immediately given him Miranda warnings. We agree that the defendant should have been considered a suspect at the point identified by the judge. However, Federal decisional law makes clear that this fact, in and of itself, does not carry the legal significance that the judge attached to it.

In *Stansbury* v. *California,* 511 U.S. 318, 323-324 (1994), the Supreme Court of the United States held that the subjective

beliefs held by law enforcement officers are irrelevant in the determination whether a person being questioned is in custody for purposes of the receipt of Miranda warnings, except to the extent that those beliefs influence the objective conditions surrounding an interrogation. See *Commonwealth* v. *Damiano*, 422 Mass. 10, 13 (1996); *Commonwealth* v. *Gallati*, 40 Mass. App. Ct. 111, 114 (1996); *Commonwealth* v. *Sim*, 39 Mass. App. Ct. 212, 220 n.8 (1995). In *Stansbury*, the Court stated that "the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury* v. *California*, *supra* at 323. It is "the compulsive aspect of custodial interrogation, and not the strength or content of the government's suspicions at the time the questioning was conducted, which led the Court to impose the *Miranda* requirements with regard to custodial questioning." *Id.*, quoting *Beckwith* v. *United States*, 425 U.S. 341, 346-347 (1976). Thus, "a police officer's subjective view that the individual under questioning is a suspect, if undisclosed, does not bear upon the question whether the individual is in custody for purposes of Miranda. . . . Save as they are communicated or otherwise manifested to the person being questioned, an officer's evolving but unarticulated suspicions do not affect the objective circumstances of an interrogation or interview, and thus cannot affect the Miranda custody inquiry." *Id.* at 324. "An officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned," but "[t]hose beliefs are relevant only to the extent they would affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her 'freedom of action.' " *Id.* at 325, quoting *Berkemer* v. *McCarthy*, *supra* at 440.

These principles of Federal law instruct that the considerations stated in the second *Bryant* factor (whether the investigation has begun to focus on the suspect, including whether there is probable cause to arrest the suspect) are material to the custody inquiry only to the extent that an officer's suspicions influence the objective conditions of an interrogation, such that a reasonable person in the position of the person being questioned would

not feel free to leave the place of questioning.[6] The fact that the considerations in the second *Bryant* factor no longer have the significance they may once have had was emphasized by the United States Court of Appeals for the First Circuit in *United States* v. *Ventura, supra.* In reversing a trial court ruling which had relied, in part, on the considerations in the second *Bryant* factor, the court stated the following:

"Finally, we note that the [trial] court, relying on outmoded circuit opinions, discussed certain factors, such as whether there was probable cause to make an arrest and the officers' focus on the defendants, which are not relevant to a *Miranda* inquiry. At one time, certain courts found these factors relevant, see, e.g., *United States* v. *Henry,* 604 F.2d 908, 915 (5th Cir. 1979) (articulating a four fac-

[6]Our research discloses that the second *Bryant* factor has a dubious history. Relying on *United States* v. *Carollo,* 507 F.2d 50 (5th Cir.), cert. denied, 423 U.S. 874 (1975), and *Miranda* v. *Arizona,* 384 U.S. 436, 444 n.4 (1966), we first articulated this factor as pertinent to the custody analysis in *Commonwealth* v. *Haas,* 373 Mass. 545, 553 (1977), *S.C.,* 398 Mass. 806 (1986).

In *Escobedo* v. *Illinois,* 378 U.S. 478, 490-491 (1964), the United States Supreme Court held that, among other considerations, where an "investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect . . . the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied 'the Assistance of Counsel' in violation of the Sixth Amendment to the Constitution . . . and . . . no statement elicited by the police during the interrogation may be used against him at a criminal trial." Subsequently, in *Miranda* v. *Arizona,* 384 U.S. 436, 444 & n.4 (1966), the Court apparently retracted from the importance it had placed on "focus" in *Escobedo.* After stating that "custodial interrogation" means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way," *id.* at 444, the Court noted that "[t]his is what we meant in *Escobedo* when we spoke of an investigation which had focused on an accused." *Id.* at 444 n.4. Thereafter, in *Beckwith* v. *United States,* 425 U.S. 341, 346-347 (1976), quoting *United States* v. *Caiello,* 420 F.2d 471, 473 (2d Cir. 1969), cert. denied, 397 U.S. 1039 (1970), the Court stated that "[i]t was the compulsive aspect of custodial interrogation, and not the strength or content of the government's suspicions at the time the questioning was conducted, which led the court to impose the *Miranda* requirements with regard to custodial questioning."

Thus, it is questionable whether the second *Bryant* factor was ever relevant to the Miranda inquiry. As we discuss *infra,* even the Fifth Circuit has renounced its relevance for purposes of the custody determination.

tor test for custody that included these factors)[7], but subsequent Supreme Court decisions rejected this approach. See, e.g., *Berkemer*, 468 U.S. at 422 . . . (emphasizing the objective nature of the inquiry). Indeed, in light of these cases, the Fifth Circuit repudiated its four-factor test, announcing that '[p]robable cause and focus become material to the custody inquiry only when they influence a reasonable person's perception of the situation.' *United States* v. *Bengivenga*, 845 F.2d 593, 596-97 [(5th Cir.) (en banc), cert. denied, 488 U.S. 924 (1988)] (footnote omitted)."[8]

*United States* v. *Ventura, supra* at 712. As the court further emphasized, and as we have stated above, "the ultimate inquiry is whether there was 'a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.' *Thompson* v. *Keohane*, [516 U.S. 99, 112 (1995)] (quotation marks and citations omitted); *Stansbury* v. *California*, [*supra* at 323] (per curiam) (same)." *United States* v. *Ventura, supra* at 710.

It follows from what has been said, that the fact that Shea may have thought the defendant was a suspect in the murder is of consequence only to the extent that his beliefs would influence a reasonable person's perception of the situation. We do not think that Shea's beliefs, which were conveyed neither "by word [nor] deed," would have indicated to a reasonable person in the defendant's position that he was compelled to remain in the interview room and answer any question that followed the moment when Shea realized the defendant's and Kaudy's accounts were inconsistent, or the moment when Kaudy had emphasized that she was certain as to her account. There was

---

[7]The United States Court of Appeals for the Fifth Circuit in *United States* v. *Henry*, 604 F.2d 908, 915-916 (5th Cir. 1979), relied on its earlier decision in *United States* v. *Carollo, supra* (see note 6, *supra*).

[8]The four-factor test that the court in *United States* v. *Ventura*, 85 F.3d 708, 712 (1st Cir. 1996), disavowed is not the same as the *Bryant* test. As the United States Court of Appeals for the Fifth Circuit noted in *United States* v. *Bengivenga*, 845 F.2d 593, 595 (5th Cir.) (en banc), cert. denied, 488 U.S. 924 (1988), the four factors included the following: "(1) whether there was probable cause to arrest the defendant, (2) whether the investigation was focused on the defendant at the time of the interrogation, (3) whether the law enforcement officer had a subjective intent to hold the defendant, and (4) whether the defendant subjectively believed that her freedom [of action] was significantly restricted."

no evidence, nor did the judge find, that any suspicion of any criminal activity on the defendant's part had been conveyed to him, or that the nonaggressive, informal, and nonthreatening tenor of the defendant's interview had changed at this moment in time. Although Shea may have harbored suspicions about the defendant's role in the murder, an objective view of the circumstances surrounding the interview at the time the defendant made the statement at issue does not disclose that there was a " 'restraint on [the defendant's] freedom of movement' of the degree associated with a formal arrest," *California v. Beheler*, 463 U.S. 1121, 1125 (1983), quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977), so as to place the defendant in custody.

While Shea's statement that the defendant "be truthful" was noncoercive, see *Commonwealth v. Mandile*, 397 Mass. 410, 414-415 (1986), the question remains whether Shea's pointing out the inconsistency between the defendant's and Kaudy's statements would suggest to a reasonable person in the defendant's position that he had become a suspect in a criminal investigation, and therefore influenced his perception that he was not free to leave the interview room. We conclude that the judge's determination that Shea's statement "was not designed to induce an incriminating response, but was merely intended to clarify what might have been a minor, explicable inconsistency" is supported by the record and is not clearly erroneous.

The defendant relies on a number of factors to support his contention that he was in custody at the time he made the statement at issue to Shea. In particular, he notes that he asked permission to speak to Kaudy and McCormack during the third interview, he asked permission to smoke, and he was told that his vehicle was being impounded with or without his consent. Each of these incidents occurred after the defendant made the statement to Shea, and after he had received Miranda warnings. That, later in the evening, the defendant reasonably may have believed that he was not free to leave is not pertinent to the question whether he was free to leave at the time he made the statement to Shea. Considering all the circumstances, we conclude that a reasonable person in the defendant's position would not have understood that he was in custody at the moment he made the statement at issue. See *Berkemer v. McCarty*,

468 U.S. 420, 442 (1984); *Commonwealth* v. *Damiano*, 422 Mass. 10, 13 (1996).[9]

Finally, the judge made extensive findings that each time the defendant was advised of his Miranda rights, he understood and waived those rights, and otherwise voluntarily spoke to the police. Based on these findings, she concluded that "the defendant's waiver of his rights each time was made knowingly, voluntarily and intelligently beyond a reasonable doubt." The judge's findings and conclusions are fully supported by the evidence.

3. Because we conclude that the defendant's Miranda rights were not violated during the second interview, the statements made by the defendant following the administration of Miranda warnings during that interview, as well as the statements he made during the third interview, were not tainted and therefore should not be suppressed.

So much of the order of the Superior Court suppressing the defendant's statements is reversed. An order is to enter denying the defendant's motion to suppress in its entirety.

*So ordered.*

---

[9]The facts support the position that the defendant did not view his freedom as curtailed. For example, even after being administered Miranda warnings and concluding his interview with Sergeant Shea, the defendant left the interview room, stepped outside the police station to speak with Kaudy, and walked over to the fire station to watch television.