Troy, Paul E., J.
This matter comes before the court on the motion of the defendant, James Bing (Bing), to suppress incriminating statements he allegedly made to a police officer while he was being transported by ambulance from Brockton Hospital to Brigham and Women’s Hospital in Boston. Bing argues that the statements should be suppressed because they were taken in violation of Miranda v. Arizona, 384 U.S. 436 (1966), and the Fifth Amendment of the United States Constitution. For the reasons discussed below, the defendant’s motion is DENIED.
FINDINGS OF FACT
The following findings of fact are based on the evidence adduced at the defendant’s motion to suppress hearing, and the reasonable inferences drawn from that evidence.
In the early morning hours of January 19, 2006, Sergeant Richard Warmington (“Sgt. Warmington”) received a telephone call at his home informing him that a stabbing had taken place at “Our Place,” a bar in Bridgewater, Massachusetts. Sgt. Warmington was further advised that there were at least three people involved in the incident, that one of the individuals had been stabbed and taken to the Brockton Hospital for medical treatment, that the two other individuals were at a local Cumberland Farms store, and that one of the two individuals at the Cumberland Farms was also injured.
After receiving the call, Sgt. Warmington went to the Brockton Hospital. When he arrived, he learned that the person who had been stabbed — Jody Martyniak (Martyniak) — had died. He also learned that an individual — later identified as Bing — had cut his hand and was in a treatment room. At this time, Bing was not a suspect and Sgt. Warmington did not know if Bing was one of the individuals involved in the incident at Our Place. Sgt. Warmington entered Bing’s treatment room; he was not in uniform. Bing was seated on a hospital bed. His right hand was heavily bandaged. A nurse was with him. The nurse told Sgt. Warmington that Bing had received .2 milliliters of morphine at 3:05 a.m. and that she was going to give him .4 milliliters more. Sgt. Warmington was further advised that Bing was going to be transported to the Brigham and Women’s Hospital in Boston. Sgt. Warmington did not know the extent of the injuries to Bing’s hand, although he knew that it must be serious if he was going to be taken to Brigham and Women’s Hospital.
Sgt. Warmington asked Bing if he was in school. Bing stated that he was a Bridgewater State College student studying journalism. He did not appear to be under the influence of either alcohol or drugs. Further, when Sgt. Warmington asked him if he had taken any alcohol or drugs, he stated that he had not had any that morning or the evening before. Sgt. Warmington asked him if the morphine was affecting him and he said it was not. He appeared matter of fact and was not showing signs of pain. He did not mention pain to Sgt. Warmington. Throughout this interaction, Sgt. Warmington found Bing to be lucid and did not have trouble understanding him.
At approximately 3:40 a.m., Sgt. Warmington orally advised Bing of his Miranda rights. Sgt. Warmington then handed Bing a Miranda rights waiver form and asked him to read it and to tell him when he was finished. The form sets forth a suspect’s rights under Miranda. Below the explanation of rights, the form states, “I understand each of these rights and, having those rights in mind, waive them voluntarily and wish to make a statement.” Below this, there is a signature line for the suspect, a line for the date and time of the waiver, and a signature line for a witness. Bing read the form for about thirty to sixly seconds and told Sgt. Warmington that he had read it and he understood it. Bing then signed the form on the signature line provided at the bottom of the page, indicating that he understood his rights and intended to waive them, and intended to make a statement.[1]
Sgt. Warmington also gave Bing a “Massachusetts State Police Interview Electronic Recording” form. This form states that the police will electronically record the interview unless the suspect refuses to be recorded. It also states that if the suspect refuses to be recorded, he can request that the police begin recording at any *257 point during the interview. Below these statements, there are two lines that can be initialed or checked by the suspect. Next to the first line, the form states, “I agree to have my interview electronically recorded.” Next to the second line, the form states, “I decline to have my interview recorded. I understand that my interview will be recorded if, at any time, I request that it be recorded.” Below these lines there are three separate signature lines: one for the suspect and two lines for witnesses. Bing stated that he did not want to record the interview, made an “X” next to the line stating that he declined to have his interview recorded, and signed on the signature line provided below. Sgt. Warmington and another officer signed on the signature lines provided for witnesses. Bing and the officers also dated the form and indicated the time at which it was signed.[2]
Shortly after Bing signed the Miranda waiver and the electronic recording form, the ambulance arrived to take Bing to the Brigham and Women’s Hospital and thus the interview, which had lasted approximately five to seven minutes, ended. Bing was not a suspect at the time and Sgt. Warmington did not feel that he had probable cause to arrest him, as he did not have any information as to Bing’s involvement in the earlier altercation.
Before the ambulance left, at approximately 4:30 a.m., Trooper Anna Brooks (Trooper Brooks) arrived at the Brockton Hospital: she was dressed in civilian clothes. She had received a telephone call at home at about 4:00 a.m. from Captain Mason. Captain Mason apprised her of the incident at Our Place, informing her that three people had been involved in a fight in a parking lot at the bar, that one individual— Martyniak — was dead, that one — Bing—was injured, and that the third individual was currently at the Bridgewater Police Station. Captain Mason further informed Trooper Brooks of Bing’s location at Brockton Hospital, stated that Bing was going to be transferred to a Boston hospital shortly, and asked Trooper Brooks to go to Brockton Hospital.
When Trooper Brooks arrived at the hospital, she spoke with Sgt. Warmington, who gave her the electronic recording form and the Miranda waiver that Bing had signed. Sgt. Warmington told Trooper Brooks that the ambulance was waiting for Bing, that he had advised Bing of his rights, and that Bing did not want the interview recorded, but was willing to speak with police. Additionally, Sgt. Warmington told Trooper Brooks that Bing had been given morphine, but did not inform her of the amount he had received. Trooper Brooks also knew that Bing was going for surgery. She had no other information regarding the fight or whether there were witnesses at this time, did not know that a knife had been seized, and did not believe that Bing was a murder suspect; as far a she knew, he was a victim. Sgt. Warmington then collected Bing’s clothes, as well as Martyniak’s, and left the hospital.
After Sgt. Warmington’s departure, Trooper Brooks got into the ambulance with Bing and an EMT. She did not ask Bing’s permission to ride in the ambulance with him but asked him if he still wanted to speak with her. He answered that he did. They were in a standard box-type ambulance. It was dimly lit inside. Bing was somewhat sitting up but was strapped to the stretcher dressed in a johnny. Both Trooper Brooks and the EMT were seated in the back of the ambulance with Bing. Trooper Brooks did not re-advise Bing of his Miranda rights or his right to have the conversation recorded.
Bing was conscious and alert. Trooper Brooks saw no signs of drowsiness or any indication that he might be under the influence. She asked him if he had taken any alcohol or drugs. He told her that he had a sip of beer at Bogart’s and a shot of morphine at the hospital but that he felt fine. Bing never looked like he was in pain during the ride, never said that he was tired, and never looked like he was falling asleep. Trooper Brooks did observe, however, that his hand was completely wrapped from the elbow to the fingers and, by the time they reached Boston, the bandages were soaked through with blood.
Trooper Brooks asked Bing how he was and what had happened; she wanted to know his version of events because she did not know what had taken place. Bing said that his fingers had been severed. He also stated that he was a freshman at Bridgewater State College and that he lived there with two roommates. On January 18, 2006, he was doing homework until midnight and then he went to Bogart’s to meet his friend, a classmate at Bridgewater State, and his friend’s girlfriend. Bing then gave an exculpatory statement, stating, in essence, that he had been attacked without cause by a man with a knife; his fingers were injured when he put up his hand up to defend himself; he did not stab the decedent; and he believed that the attack upon him was racially motivated. When they arrived at Brigham and Women’s Hospital, an EMT told Trooper Brooks that Bing needed surgery and thus the interview ended.
BING’S TESTIMONY AT THE HEARING
Bing testified at the hearing concerning the events that took place at the Brockton Hospital and in the ambulance. He stated the following.
He was a freshman at Bridgewater State College and nineteen years old. On January 19, 2006, at about 2:00 a.m., he was taken to the Brockton Hospital because his index finger and the middle finger on his right hand were partially severed in a fight at a bar in Bridgewater. His index finger was cut midway through and hanging off. His middle finger was cut to the bone but was not hanging off. At Brockton Hospital, he received 2 to 3 shots of morphine. His clothes were cut off. He was put on an I.V. the whole time he was at the hospital. He had to urinate several times at Brockton Hospital because of the I.V. he was receiving. His hand *258 was in pain and throbbing. It was rebandaged two times because of the heavy blood flow and they had to give him a blood transfusion.
While he was there, about six troopers came in. Although he remembers Sgt. Warmington, he does not recall signing any forms and he does not recall talking with him or what he said. He does recall that he was wearing a hospital johnny and he was cold. He further testified that he continued to receive an I.V. in the ambulance. He did not know if he received more medication in the ambulance, but stated that he did ask for it. He stated that he repeatedly fell asleep and dozed off between questions in the ambulance, that he was very drowsy, and that he felt like he was looking in at himself from the outside. The court does not find Bing’s testimony that he is unable to recall anything about the interviews to be credible, as Bing never demonstrated any outward manifestation of pain or confusion, his testimony revealed that he was well aware of his condition and his surroundings, he provided detailed descriptions of both at the hearing, and he provided detailed descriptions of other events that occurred that evening.
DISCUSSION
Bing argues that, given his physical condition, he did not understand his rights pursuant to Miranda. He thus contends that the statements that he made to Trooper Brooks must be suppressed. This argument rests on dual propositions: (1) that Bing was in custody of the police and subject to interrogation at the time he made the statements; and (2) that, although he was advised of his rights, he did not waive them voluntarily.
I. Applicability of Miranda
Miranda warnings are only required when a suspect is subject to custodial interrogation. Commonwealth v. Morse, 427 Mass. 117, 122 (1998). The defendant bears the burden of proving that he was subject to a custodial interrogation. Commonwealth v. Larkin, 429 Mass. 426, 432 (1999). To find custodial interrogation, the court must first “examine all the circumstances surrounding the exchange between the government agent and the suspect.” Morse, 427 Mass. at 123.
A. Custody
A determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned. Id. at 124. Factors to consider include: (1) the place of the interrogation; (2) whether the officer(s) conveyed to the person being questioned that he was a suspect; (3) whether the interrogation was formal and/or aggressive, or informal; and (4) whether the suspect was free to leave or, in the alternative, whether the interrogation culminated in the suspect’s arrest. Commonwealth v. Sneed, 440 Mass. 216, 220 (2003). An individual restrained for medical treatment by medical personnel is not in custody and therefore need not be read his Miranda rights prior to police questioning conducted under such circumstances. Commonwealth v. LaFleur, 58 Mass.App.Ct. 546, 550-51 (2003).
In LaFleur, a police officer was dispatched to a two-car accident. LaFleur, 58 Mass.App.Ct. at 547. When the officer arrived at the scene, he saw the defendant seated in the driver’s seat of one of the cars. Id. The officer noticed that the defendant appeared to be dazed and that his breath smelled of alcohol. Id. He had a severe laceration on his head and the officer prevented him from leaving until the EMTs arrived. Id. Upon their arrival, EMT personnel removed the defendant from the car, strapped him to a stretcher, and placed him in an ambulance. Id. The officer at the scene then proceeded to question the defendant as to how much he had had to drink and whether his alcohol intake had affected his ability to operate his motor vehicle. Id. In response to these questions, the defendant made several inculpatory statements. Id. He was then taken to the hospital, where the officer asked similar questions in the Emergency Room and the defendant gave the same inculpatory answers. Id. Subsequently, the defendant sought to suppress his statements on the ground that he was not advised of his rights under Miranda. Id. at 546-47.
The Court held that the statements should not be suppressed because tire defendant was not in custody at the time and thus his statements were not subject to Miranda. Id. at 550-51. Specifically, the Court stated that the defendant was not in custody because (1) the questioning occurred in public and EMT personnel were present, therefore diminishing the possibility of police domination, and there was only one officer present at the time of the questioning; (2) the officer did not convey that the defendant was suspected of a crime; (3) the interrogation was brief; and (4) a reasonable person in the defendant’s position would have understood that his detention was by medical personnel for medical purposes, and its length would therefore be determined by his medical condition, not by his refusal to provide answers to the officer. Id.
The pertinent facts here are virtually indistinguishable from those set forth in LaFleur. Trooper Brooks did not question Bing until he was already being restrained for medical treatment by the EMTs, and there was an EMT present during the entire conversation; Trooper Brooks did not convey that Bing was suspected of a crime — in fact she did not suspect him when she began questioning him; the interrogation was relatively brief — the interview did not extend beyond the length of the ride; and finally, it would have been clear to a reasonable person in Bing’s position that he was restrained in the ambulance by medical personal for the purpose of medical treatment and not by Trooper Brooks. In light of these facts, the court *259 does not conclude that Bing was in custody when Trooper Brooks questioned him, thus his statements were not subject to Miranda, and need not be suppressed for lack of a valid waiver. See id.; Sneed, 440 Mass. at 220; Morse, 427 Mass. at 122-23.
B. Interrogation
Because the court finds that Bing was not in custody, his statements are not subject to Miranda, regardless of whether he was subject to interrogation. Nonetheless, the court finds that Bing was not interrogated. Interrogation occurs when the police engage in express questioning, or its functional equivalent, that the police know, or should know, is reasonably likely to invoke an incriminating response from a suspect. Commonwealth v. Torres, 424 Mass. 792, 796-97 (1997). The warnings are not required for general on-the-scene questioning as to facts surrounding a crime or other general questioning in the fact finding process. Commonwealth v. Doyle, 12 Mass.App.Ct. 786, 791-92 (1981); see also Commonwealth v. Borodine, 371 Mass. 1, 4-5 (1976). Rather, the primary focus of inquiry is on the perceptions of the suspect — specifically whether the police statements and conduct would be perceived as interrogation by a reasonable person in the same circumstances. Torres, 424 Mass. at 797. The subjective intent of the police also has some relevance because it bears on whether the police should have known their words or actions were reasonably likely to elicit an incriminating response. Id. at 798. Nonetheless, the mere fact that a police officer may be aware that there is a possibility that a suspect may make an incriminating statement is insufficient to establish interrogation. Id. at 798.
Here, Trooper Brooks’s questions were designed to obtain preliminary information about the circumstances surrounding the fight and thus did not constitute interrogation. When she arrived at the hospital, Trooper Brooks knew only that there had been a fight, that one person had died, and that one person was injured. She had no other information regarding the fight and told Bing that she wanted to hear his version of events because she did not know what had happened. As such, she made it clear that the purpose of the conversation was to determine what Bing knew about the circumstances surrounding the fight and thus a reasonable person in Bing’s position would not have believed that he was being interrogated. See Torres, 424 Mass. at 797; Commonwealth v. Smith, 35 Mass.App.Ct. 655, 657-58 (1993) (officer’s question about what happened to defendant’s damaged car shortly after a hit and run accident involving a vehicle that matched the car that the defendant was driving did not trigger Miranda because some preliminary questions are permissible to enable the police to orient themselves); Doyle, 12 Mass.App.Ct. at 793-94 (officer’s questions to defendant at scene of car accident in which passenger was killed and driver was unknown did not constitute interrogation because, at that point, the questions were general in nature and were directed toward discovering what the defendant knew about the circumstances of the accident).
Trooper Brooks’s subjective intent also supports the conclusion that her questions did not constitute interrogation for the purposes of Miranda. As found above, she knew only that there had been a fight and that Bing had been injured in the fight. She did not know that a knife had been seized from the scene and did not believe that Bing was a murder suspect. To the contrary, as far as she knew, Bing was the victim. The mere possibility that Bing might make an incriminating statement when he provided her with his version of events is not sufficient to establish interrogation. See Torres, 424 Mass. at 798. In light of the fact that Trooper Brooks’s questions amounted to preliminary investigation to determine the facts surrounding the crime, and she did not subjectively believe that Bing was a suspect at the time she questioned him, the interview in the ambulance does not constitute interrogation for the purposes of Miranda. See id.; Smith, 35 Mass.App.Ct. at 658; Doyle, 12 Mass.App.Ct. at 793-94.
II. Miranda Analysis
Although the court need not reach the question of whether Bing made a knowing, intelligent, and voluntary waiver of his rights because it has already found that his statements are not subject to Miranda, it nonetheless finds that, if Miranda were applicable, Bing would have made a knowing, intelligent, and voluntary waiver.
If a suspect’s statements are subject to Miranda and the suspect has been properly Mirandized and subsequently waives his rights, his statements are admissible against him at trial as long as the waiver was made knowingly, intelligently, and voluntarily, and the statements themselves were made voluntarily. Commonwealth v. Leahy, 445 Mass. 481, 487 (2005); Commonwealth v. Hilton, 443 Mass. 597, 606 (2005). It is the Commonwealth’s burden to demonstrate beyond a reasonable doubt that the police properly advised the suspect of his Miranda rights and that a valid waiver was obtained. Commonwealth v. Day, 387 Mass. 915, 921 (1983).
A. Validity of the Waiver
For a waiver to be made knowingly, intelligently, and voluntarily, the suspect must understand the Miranda warnings themselves. Hilton, 443 Mass. at 606. The court looks to the following factors in determining whether the defendant’s waiver of his Miranda rights was valid: the details of the interrogation, including the recitation of Miranda warnings; whether promises or other inducements were made by the police at the time the statement was made; the defendant’s age, education, and intelligence; whether he was under the influence of drugs or alcohol at the *260 time he made the statements; his experience with the criminal justice system; and his physical and mental condition, Commonwealth v. Scott, 430 Mass. 351, 355 (1999), citing Commonwealth v. Selby, 420 Mass. 656, 663 (1995), although injury and administration of pain medication do not, their own, render a waiver invalid. Commonwealth v. Wilborne, 382 Mass. 241, 249-51 (1981). The police may infer that a suspect has understood his Miranda warnings from his outward behavior, especially his indication that he understands his rights, waives them, and wishes to talk. Commonwealth v. Garcia, 379 Mass. 422, 429 (1980).
Bing argues that his physical condition — namely his injury, morphine drip, and pain — impaired his ability to understand, and thus validly waive, his rights under Miranda The evidence, however, is to the contrary. First, as found above, Bing told Sgt. Warmington that he was not under the influence of any alcohol or drugs and that the morphine was not affecting him. He did not show any signs of pain, was lucid when he spoke with Sgt. Warmington in his hospital room, and Sgt. Warmington did not have trouble understanding him when they spoke. Bing’s appearance and conduct during his conversation with Trooper Brooks further supports the conclusion that his physical condition did not impair his ability to understand and validly waive his rights under Miranda Bing was conscious and alert throughout the conversation with Trooper Brooks. He also told her that he had only had a sip of beer, and that, although he had received a shot of morphine, he felt “fine.” He did not appear to be in pain, never said that he was tired, and never looked like he was falling asleep.
Moreover, Bing’s responses to both Sgt. Warmington and Trooper Brooks’s questions indicate that his physical condition did not impair his ability to validly waive his rights; his answers made sense, were very detailed as to time and place, and he provided self-serving answers to Trooper Banks. See Commonwealth v. Beland, 436 Mass. 273, 281-82 (2002) (defendant’s articulate and coherent statements, and completely exculpatory explanation of events, indicated that waiver of rights was valid); Commonwealth v. Silanskas, 433 Mass. 678, 685-86 (2001) (defendant’s responsive, coherent, and self-serving answers to police inquiries supported conclusion that waiver was valid).
In addition to Bing’s physical appearance and conduct, the following additional circumstances indicate that Bing understood and validly waived his rights: Bing was nineteen years old and had completed over a semester of college; Sgt. Warmington both orally advised Bing of his rights and provided him with a written advisement, which Bing stated that he read, understood, and signed; and there is no evidence that Sgt. Warmington made any promises or offered Bing any inducements when he waived his rights. See Scott, 430 Mass. at 355. Based on this evidence and the totality of the circumstances, the court finds that neither Bing’s physical condition, nor any of the other circumstances present at the time, impaired his ability to knowingly, intelligently, and voluntarily waive his Miranda rights, and thus his waiver was valid. See Beland, 436 Mass. at 281-82; Silanskas, 433 Mass. at 685-86; Scott, 430 Mass. at 355; Garcia, 379 Mass. at 429.
B. Voluntariness of the Statements
In addition to finding that a defendant’s Miranda waiver was voluntary, knowing, and intelligent, the court must also find that all statements made after a valid Miranda waiver were voluntary. Leahy, 445 Mass. at 487. In making this determination, the court considers whether, in the light of the totality of the circumstances surrounding the statement, the will of the defendant was overborne to the extent that the statement was not the result of a free and voluntary act. Commonwealth v. Raymond, 424 Mass. 382, 395 (1997). The factors the court considers to determine whether the statements themselves were voluntary are the same as those the court considers in determining whether a waiver is voluntary; Leahy, 445 Mass. at 486, n.5; Scott, 430 Mass. at 355; as well as the following additional factors: the length of the detention; whether the questioning was repeated or prolonged; whether physical punishment was imposed; and whether the defendant was advised of his constitutional rights. Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973); Commonwealth v. Montanez, 55 Mass.App.Ct. 132, 142-43 (2002).
Here, all the aforementioned facts indicating that Bing’s waiver was voluntary also indicate that his statements were voluntary. See Beland, 436 Mass. at 281-82; Silanskas, 433 Mass. at 685-86; Scott, 430 Mass. at 355; Garcia, 379 Mass. at 429. Additionally, the police questioned Bing relatively briefly, only asking whether he was in school, whether he was under the influence of drugs or alcohol, and what his version of the events that took place were; the questions were only posed once and they were asked in a non-aggressive manner; and no sort of physical punishment was imposed. In light of these facts and the totality of the circumstances, the court finds that Bing’s statements were made voluntarily. See Schneckloth, 412 U.S. at 226; Beland, 436 Mass. at 281-82; Silanskas, 433 Mass. at 685-86; Scott 430 Mass. at 355; Garcia, 379 Mass. at 429; Montanez, 55 Mass.App.Ct. at 142-43.
ORDER
For the reasons discussed above, the defendant’s motion to suppress statements is DENIED.

 Bing signed the form with his left hand because his right hand was bandaged.

 Both Bing and Sgt. Warmington signed and dated the form at 3:40 a.m., but the time next to the second officer’s name is 4:55 a.m. Sgt. Warmington could not explain the time discrepancy, except to surmise that he forgot to have the second officer sign it until later.