COMMONWEALTH *vs.* JOSEPH SOARES.

No. 99-P-1173.

Essex. December 11, 2000. - April 6, 2001.

Present: BROWN, GILLERMAN, & DUFFLY, JJ.

*Practice, Criminal,* Instructions to jury, Access to witnesses. *Breaking and Entering. Larceny. Intent. Evidence,* Inference, Scientific test. *Constitutional Law,* Waiver of constitutional rights.

At the trial of an indictment for breaking and entering in the daytime with intent to commit a felony, error, if any, in the judge's failure to define "felony" in instructing on the element of intent to commit a felony, did not create a substantial risk of a miscarriage of justice, in circumstances in which larceny as the intended felony was fairly before the jury, on the evidence and the judge's instructions. [276-278]

At the trial of an indictment, the judge's instructions to the jury on inferences did not shift the burden of proof. [278-279]

At a criminal trial, the judge, in ruling on the defendant's pretrial motion to suppress his statements to police, properly disregarded expert opinion testimony based on the Gudjonsson Suggestibility Scale (GSS) proffered to demonstrate the involuntariness of the defendant's statements, where there was no evidence that the GSS was generally accepted within the relevant scientific community or that the GSS was otherwise reliable or valid, and where, in any event, the GSS was not shown to be applicable to the defendant's circumstances. [279-282]

A criminal defendant did not demonstrate any prejudice from the prosecutor's late disclosure of the name of a Commonwealth witness, and the judge at trial did not abuse his discretion in allowing the witness to testify. [282-284]

INDICTMENT found and returned in the Superior Court Department on February 5, 1997.

A pretrial motion to suppress evidence was heard by *Diane M. Kottmyer,* J., and the case was tried before *Allan van Gestel,* J.

*Robert D. Dimler* for the defendant.

*Catherine Langevin Semel,* Assistant District Attorney, for the Commonwealth.

BROWN, J. This case is on appeal from the defendant's conviction by a Superior Court jury upon an indictment charging him with breaking and entering in the daytime with intent to commit a felony. G. L. c. 266, § 18. The incident occurred on January 10, 1997, at a house situated on a quiet cul de sac in Methuen. Nothing was taken from the residence.[1] The defendant's position at trial was that he was in the house through misunderstanding or mistake. He presents several claims in this court: (1) that the judge improperly instructed the jury on the "intent to commit a felony element" of the crime; (2) that another aspect of the jury instructions shifted the burden of persuasion to him; (3) that it was error to deny his pretrial motion to suppress in which he contended that he did not voluntarily waive his Miranda rights; and (4) that the trial judge committed reversible error in allowing the Commonwealth to present a "surprise" witness after jury empanelment, without conducting a voir dire of the jurors. We affirm the conviction.

We first summarize the salient evidence adduced at trial, leaving other testimony for the discussion of the issues raised. Kay O'Donnell, the owner of the residence at 3 Butrand Road, Methuen, testified that, on January 10, 1997, she left the house for work at about 7:35 A.M., departing by way of a side door off the kitchen. The door was closed but unlocked.[2] O'Donnell's son, Patrick, and her daughter, Mary (Molly), were in the residence when she left. O'Donnell's husband, Joseph, had left for his job at about 5:30 A.M. O'Donnell testified that she always left two jewelry boxes, one stacked on another, on the top of the bureau in her first floor bedroom.

O'Donnell testified that she returned to her house from her teaching job in Salem upon receiving a telephone call from her eighteen year old son Patrick, whom she described as "visibly upset" upon her arrival. She immediately went to her bedroom, where she noticed her jewelry box on the bed, and that a bottom bureau drawer was open. On cross-examination, O'Donnell

---

[1] A complaint had been filed in the Lawrence District Court charging the defendant with larceny of property over $250. The defendant was not indicted on this offense.

[2] The opening of a closed but unlocked door or window constitutes a breaking in this jurisdiction. *Commonwealth* v. *Lewis*, 346 Mass. 373, 377 (1963).

stated that she found nothing missing from either her jewelry boxes or her bureau drawer, or from any other place in the residence.

Molly O'Donnell testified that she left the house at approximately 8:40 A.M. for her job at the Winchester public library. She stated that she did not go into her mother's bedroom before she left. Molly also departed by way of the kitchen side door, which has a doorbell, and she closed it because it was wintertime. She stated that it was customary for the door to be unlocked if someone was home.

The Commonwealth's principal witness was Patrick O'Donnell. Patrick, who was home alone at the time on school break, testified that he was awakened between 10:00 A.M. and 10:30 A.M. by the ringing of the door bell. As he thought it was his sister, who was "being too lazy to take out her key," he remained in bed until he heard movement downstairs about two or three minutes later. Patrick went downstairs to use the bathroom and encountered someone (later identified as the defendant) walking past him in a hallway coming from the direction of the dining room or his mother's bedroom and heading toward the side door. Patrick thought that the person might be a plumber or carpenter whom his mother had hired, and he (Patrick) said "Hello." Nevertheless, Patrick asked the defendant, who appeared to be between eighteen and twenty-two years old, what he was doing there. The defendant appeared a "little nervous," and responded that he knew Patrick's mother and that he needed to speak with her. The defendant was carrying a plastic container and said that his vehicle had overheated and that he needed water. The defendant asked Patrick to "fill it up now." Patrick asked him how long the defendant had known his mother, and the defendant's reply was about six years. Patrick told the defendant that his mother was at school, and that the defendant "should know that." He asked the defendant for his name, and was told, "Joe Miller." After Patrick assisted the defendant with the water, the defendant departed. Patrick went to a window in his mother's room to see if he could get the license plate number of the defendant's vehicle. He observed a white vehicle with a sticker on the back,

but because of the angle he could not see the plate number.[3] At that point, Patrick turned around and noticed his mother's jewelry box on the bed and the bottom drawer of the bureau open, but he left everything in place as he intended to call the police. Patrick described the defendant as wearing a baseball hat and dressed casually, and that he was wearing gloves similar to those worn at a Market Basket Store by employees whose job requires them to go into a freezer. Patrick called the police and then his mother.

Late in the evening of January 16, Patrick and a friend went to a Dunkin Donuts store at the intersection of Broadway and Route 28 in Methuen, near the Salem mall. When he pulled into the parking lot, he observed a white-colored vehicle that looked "exactly like" the one he had observed in the driveway on January 10. Patrick waited in his vehicle for a few minutes to see if he could spot the defendant and then went inside to get something to eat. There, he saw a person coming out of a backroom whom he recognized as the individual he encountered in the house. Patrick decided to "play it cool," and remained in a booth in the restaurant for about twenty minutes before he decided to go to the Methuen police station. Patrick subsequently returned to Dunkin Donuts with the police, who arrested the defendant. Patrick identified him as the person who had been in his house on January 10.

1. *Jury instructions on the "intent to commit a felony" element of G. L. c. 266, § 18.* The indictment in question charged the defendant with breaking and entering in the daytime with intent to commit a felony, but did not specify the felony.[4] Contrast *Commonwealth* v. *Hobbs*, 385 Mass. 863, 869 (1982). It was the Commonwealth's theory at trial that it was the defendant's intention to steal from the O'Donnell home. In his

---

[3]Patrick testified that he went to the Methuen police station on January 14, and told them that the sticker on the rear of the defendant's vehicle was a "WBCN 104.1 bumper sticker." Patrick later corrected himself. The sticker was "Jammin 94.5."

[4]The defendant sought no bill of particulars as to the felony that the indictment encompassed. Cf. *Commonwealth* v. *Porcher*, 26 Mass. App. Ct. 517, 521 (1988) ("If a defendant wants that kind of information, he should move for a bill of particulars"). Contrast *Rogan* v. *Commonwealth*, 415 Mass. 376, 379 (1993).

jury instructions, the judge told the jury that the crime of break-
ing and entering in the daytime had four elements which the
Commonwealth must prove beyond a reasonable doubt.
Concerning the third element, the judge stated the following:
"[T]he Commonwealth must prove beyond a reasonable doubt
that the defendant specifically intended to commit a felony. In
this case the Commonwealth contends that the defendant had
the specific intent to steal inside the house." Shortly thereafter,
the judge alluded to the Commonwealth's burden to prove
"beyond a reasonable doubt, as it must, that the defendant acted
with the specific intent to steal when he went into that house."
No objection was made to this aspect of the jury instructions.

Relying primarily on this court's rescript opinion in *Com-
monwealth* v. *Walter*, 40 Mass. App. Ct. 907 (1996), the
defendant argues that the judge's failure to define "felony," as
it is used in the context of intent to commit a felony, created a
substantial risk of a miscarriage of justice because it left the
jury with no idea of the meaning of an essential element of the
crime.[5] The defendant also contends that the judge should have
instructed that stealing in a building or residence is a felony.[6]

The defendant's reliance on the *Walter* case is of no avail. In
the first place, there was no evidence in that case, as there was
in the present case, from which a jury could infer that the
defendant's intent was to steal; the defendant was not found in
possession of anything which could be the target of a theft;
indeed, the defendant was not placed inside any specific apart-
ment in the building. Here, in contrast, the defendant was
encountered inside the O'Donnell residence, and the movement
of the jewelry boxes from the bureau to the bed, coupled with
the opened bureau drawer, are strongly suggestive of an intent
to steal. See and compare *Commonwealth* v. *Carter*, 306 Mass.
141, 149 (1940) ("In many cases, as in the familiar instance of

---

[5]The defendant refers to instruction 5.31 of the Model Jury Instructions for
Use in the District Court (1997), which recites in part: "In this Com-
monwealth, offenses for which a person may be sentenced to state prison are
called 'felonies.' Other, lesser offenses are called 'misdemeanors.' " The of-
fense of breaking and entering in the daytime falls within the definition of a
felony. *Commonwealth* v. *Sheeran*, 370 Mass. 82, 88 (1976).

[6]The Commonwealth acknowledges that the instruction would have been
clearer if the judge had told the jury that larceny in a dwelling was a felony.

a charge of breaking and entering with intent to steal, proof of the actual commission of the larceny is decisive proof of the intent with which the entry was made. The overt act leaves no room for doubt as to the felonious purpose with which the previous criminal act was perpetrated"). That nothing was taken from the O'Donnell residence does not undermine evidence of the defendant's design in entering. The jury were not left in the dark concerning the Commonwealth's theory of the defendant's intent, and the judge expressly informed them during the main body of his jury instructions that it was the Commonwealth's contention "that the defendant had the specific intent to steal inside the house."

"A finding of intent usually is based upon what reasonably is to be inferred from conduct." *Commonwealth* v. *Ronchetti*, 333 Mass. 78, 81 (1955). It has long been held that, when a person makes an illegal entry into a dwelling at night, it may be presumed, "in the absence of contrary evidence, that his intent is to steal." *Ibid. Commonwealth* v. *Shedd*, 140 Mass. 451, 453 (1886). *Commonwealth* v. *Lewis*, 346 Mass. 373, 377-378 (1963). See *Commonwealth* v. *Maia*, 429 Mass. 585, 587-588 (1999), where the court held that the time of day (when most people are at work or away from home), supported the inference of larceny as the intended felony.[7] In sum, any error in the omission of the definition of a "felony" from the jury instructions, or language informing them that larceny in a dwelling is a felony, did not create a substantial risk of a miscarriage of justice, as the theory of larceny as the intended felony was fairly before the jury in light of the evidence and instructions provided.[8]

2. *Shifting of burden of proof.* The defendant asserts that a portion of the judge's charge to the jury impermissibly shifted the burden of proof to him. After instructing the jury that they

---

[7]At trial, the defendant made a claim similar to the one made in *Commonwealth* v. *Maia*, *supra*: here he believed he was in the apartment of his brother's girlfriend's mother, whereas in *Maia*, the defendant believed he was at his girlfriend's apartment.

[8]We do not consider the defendant's claims of due process violations, because they are raised in a footnote. See Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975); *Commonwealth* v. *McHugh*, 41 Mass. App. Ct. 906, 906 n.1 (1996).

may examine the defendant's actions and words and attendant circumstances to help them determine the defendant's intent when he went into the residence, the judge stated as follows: "As a general rule, it is reasonable to infer that a person ordinarily intends the natural and probable consequences of any acts that he does intentionally. You may draw such an inference *unless there is evidence that convinces you otherwise"* (emphasis supplied). The defendant suggests that the quoted language, which was not objected to at trial, created a presumption that impermissibly shifted the burden of proof. The instruction did no such thing. The defendant relies principally on *DeJoinville* v. *Commonwealth*, 381 Mass. 246, 247-253 & n.1 (1980), but that case focused on language which created a mandatory presumption (a person *"is* presumed to have intended the natural or probable consequences of his voluntary acts . . . in the absence of evidence to the contrary" [emphasis supplied]). In contrast, the jury here were instructed that "they *may* draw such an inference," implicating only a permissive inference.

Furthermore, the phrase, "unless there is evidence that convinces you otherwise," with minor variations, appears frequently in cases in which similar instructions have been upheld.[9] See *Commonwealth* v. *Ely*, 388 Mass. 69, 75 (1983) ("So, unless the evidence in this case leads you to a different or contrary conclusion . . ."); *Commonwealth* v. *Doucette*, 391 Mass. 443, 451 n.4 (1984) (same). See also *Commonwealth* v. *Ronchetti*, 333 Mass. at 81 ("When a person, by use of force, enters a dwelling house in the middle of the night it may ordinarily be presumed, *in the absence of evidence to the contrary, that his intent is to steal"* [emphasis supplied]). We note that during his charge, the judge in the present case emphasized that the "burden of presenting the case remains on the government from start to finish." No risk of a miscarriage of justice has been made to appear. *Commonwealth* v. *Doucette*, *supra* at 450.

3. *Motion to suppress.* The defendant moved to suppress statements he made to the police on the ground that he did not

---

[9]As the Commonwealth's brief notes, the emphasized language appears in instruction 3.04 of the Model Jury Instructions for Use in the District Court (1997).

voluntarily and intelligently waive his rights and that their admission in evidence was in contravention of his due process rights.[10] After hearing, the motion judge filed a memorandum of decision containing findings of fact, rulings of law, and an order denying the motion. In so ruling, the judge discounted testimony of Robert Joss, a forensic psychologist, who evaluated the defendant's mental status (he concluded that the defendant had "limited cognitive functioning," although he was competent), as well as the defendant's suggestibility. Joss testified, without objection, that he administered the Gudjonsson Suggestibility Scale (GSS) to the defendant, concluded that the defendant was highly suggestible to pressure, and that if accused of prevaricating by the police, the defendant would change his response.[11] Joss had employed the test on only a dozen occasions. The motion judge based her decision to accord no weight to Joss's testimony concerning the results of the GSS test, or to his opinions based thereon, on two grounds: (1) Joss's acknowledgment[12] that the application of the GSS results to a custody situation may not be valid because, "although there is no downside to yielding to a desire to please the examiner in the typical test situation, fear of self-incrimination and its consequences may act as a strong counterweight during an interrogation," and (2)

---

[10]On the morning of trial, the defendant moved for a voir dire regarding the voluntariness of his statements, but as the matter had already been determined, the judge denied the motion. During his charge to the jury, the judge instructed on the "humane practice." See *Commonwealth* v. *Tavares*, 385 Mass. 140, 149-153 (1982).

[11]During the interview with the defendant at the Methuen police station, Detective Simone suggested to the defendant after certain responses that he was not telling the truth. On a couple of such occasions, the defendant cried, and he would backtrack and add new details to his story when confronted.

[12]During the Joss testimony, the judge commented, "That's what strikes me as a problem with the utility of taking the test results which say something about how he responds typically in a testing situation and transferring them to this particular situation." The witness's response was that "the question is whether or not he [a putative defendant being interrogated] perceives himself to be in deeper trouble by change in a response. If he would perceive himself to be in deeper trouble, then he would probably be less likely to change . . . in that direction," which would modify the suggestibility. The witness appeared to agree with the judge's characterization. Joss also acknowledged, on cross-examination, that if the atmosphere during the interrogation was devoid of physical force or yelling by the police, that would affect his opinion. The defendant then would be under less duress.

"because the record contains no evidence that the GSS is a scientifically valid and reliable measure."

As a result of the opinion in *Canavan's Case*, 432 Mass. 304, 310-312, 317 (2000) (Greaney, J. concurring), we review a judge's determination of the reliability of scientific testimony under an abuse of discretion standard. "[A] party seeking to introduce scientific evidence may lay a foundation either by showing that the underlying scientific theory is generally accepted within the relevant scientific community, or by showing that the theory is reliable or valid through other means." *Commonwealth* v. *Sands*, 424 Mass. 184, 185-186 (1997). The defendant claims that he was not proffering the GSS test as a novel scientific opinion. Indeed, without defining what he means, he claims that it was a "routine test,"[13] perhaps a characterization which he believes will dispense with his need to show that the test was either scientifically valid or that it was reliable. He argues merely that the judge "should have accepted the validity of the test, and reserved h[er] concerns about it for an evaluation of the weight of its results."

The defendant presented no evidence as to whether the GSS test was accepted in the scientific community, as the judge's memorandum explicitly states.[14] Although the memorandum, an excerpt of which appears in the margin, also mentions the absence of evidence of the test's reliability, the judge appears to have made an implicit finding that the test was not reliable with respect to its applicability to the defendant's circumstances, that is, in a custodial situation. "Determining whether . . . scientific testimony is reliable often will hinge on the presentations made by the parties in a particular case." *Canavan's Case*, 432 Mass.

---

[13]Dr. Joss testified that he had given the test only "a dozen or so times" in his fifteen years of practice as a forensic psychologist, and he did not indicate that he had ever presented such test results in court although he had testified "several hundred" times.

[14]As put by the judge, "the record is devoid of evidence demonstrating either the scientific validity and reliability of the GSS as a measure of susceptibility to suggestion or appropriate applications of the test results." The latter phrase, fairly read, has reference to the circumstances peculiar to the defendant, specifically, his custody status.

The only opinion of an appellate court in this jurisdiction which refers to the Gudjonsson scale is *Commonwealth* v. *Landenburg*, 41 Mass. App. Ct. 23, 25 (1996), and that reference merely cites to an article.

at 312. The judge's implicit finding was consistent with her "gatekeeper" role, that is, to make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of *whether that reasoning or methodology properly can be applied to the facts in issue*" (emphasis supplied). *Commonwealth* v. *Lanigan*, 419 Mass. 15, 26 (1994), quoting from *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-593 (1993). The judge in essence concluded that, because the defendant was under interrogation and subject to "countervailing pressures," the GSS test was not likely to be reliable in the circumstances of the case.

We think it unlikely that the judge's conclusion as to the voluntariness of the defendant's statements would in any event have been altered by the expert testimony. The judge found no evidence of overbearing behavior on the part of the police, and she concluded that "[t]he changes in the defendant's story were consistent with an awareness that he was in trouble and a desire to exculpate himself; they were not suggestive of a will that was overborne." It is significant, as the judge noted, that while the defendant recanted his story that he had been at home sleeping at the time of the incident, and changed some details of his story, the defendant advanced an innocent explanation concerning his presence in the O'Donnell house. The judge found that the Commonwealth had satisfied its burden to establish the voluntariness of the waiver and statements beyond a reasonable doubt. We have concluded that no evidence as to the scientific validity of the Gudjonsson scale was presented. The judge correctly determined, in the exercise of a traditional fact-based inquiry, that in the circumstances of this case the test would not be reliable. There was no abuse of discretion, and the motion to suppress the defendant's statements was correctly decided.

4. *Surprise witness.* The defendant's final contention is that he was prejudiced by the disclosure of a "surprise witness" (Molly O'Donnell), whose name apparently did not appear in any information. provided through discovery, and who was the last person to leave the house before the defendant's arrival. The defendant maintains that the judge should have conducted a

voir dire of the jurors to ascertain whether any of them were acquainted with the witness.[15]

The matter surfaced at the outset of the second day of the trial, after empanelment of the jury and the opening arguments. The prosecutor proffered that she had been on trial elsewhere and did not learn of the name of the witness until speaking with the family the evening before trial, and she stated that in her opinion Molly's presence did not "change[] the factual scenario" other than to say that there was an additional person in the house who would testify that she did not move her mother's jewelry boxes before she left the house, nor did she lock the door. The judge ruled the witness could testify, concluding that the witness would not "hurt the defendant in any realistic way."

The defendant has not shown the requisite prejudice stemming from the late disclosure of the witness. *Commonwealth* v. *Pope*, 19 Mass. App. Ct. 627, 630-631 (1985). See and compare *Commonwealth* v. *Fudge*, 20 Mass. App. Ct. 382, 388-389 (1985). Molly O'Donnell's testimony was brief (taking up only four pages of transcript), and it was cumulative of her mother's testimony. See *Commonwealth* v. *Gonsalves*, 23 Mass. App. Ct. 184, 188-189 (1986). She testified as represented. The circumstances were not such as to require any significant preparation time by the defense. See and compare *Commonwealth* v. *Dranka*, 46 Mass. App. Ct. 38, 42 (1998). The Commonwealth concedes that it would have been preferable for the judge to have conducted a voir dire with the already seated panel, but the failure to do so would not amount to reversible error in the absence of prejudice to the defendant. See, e.g., *Commonwealth* v. *Campbell*, 394 Mass. 77, 84 (1985). We

---

[15]The judge previously made specific inquiry of the venire by asking: "The alleged victims in this case are Patrick O'Donnell and Kay O'Donnell of Methuen. Do you know or are you related to them or to any member of their immediate family and I see no hands raised." We presume that anyone acquainted with the O'Donnell family would have known Molly was a member of the "immediate family" as characterized in the judge's question and would have answered affirmatively. The judge did not inquire of the empaneled jurors whether they were acquainted with Molly O'Donnell following the bench conference at which the prosecutor divulged her presence.

discern no abuse of discretion in the judge's allowing the witness to testify.

*Judgment affirmed.*