COMMONWEALTH *vs.* JOSE MANUEL MONTANEZ.

No. 99-P-1809.

Hampden. May 14, 2001. - June 12, 2002.

Present: PERRETTA, BECK, & BERRY, JJ.

*Homicide. Malice. Practice, Criminal,* Instructions to jury, Presumptions and burden of proof, Motion to suppress, Arraignment, Delay in commencement of prosecution. *Evidence,* Admissions and confessions, Voluntariness of statement, Expert opinion. *Search and Seizure,* Threshold police inquiry. *Threshold Police Inquiry. Due Process of Law,* Delay in commencement of prosecution. *Constitutional Law,* Admissions and confessions, Waiver of constitutional rights. *Witness,* Expert, Psychologist.

At a criminal trial, flawed provocation and manslaughter instructions created a substantial risk of a miscarriage of justice, requiring reversal of the defendant's conviction of murder in the second degree, where the theory of defense rested on both issues, which were squarely raised by the evidence, and where the erroneous instructions were given four times to the jury. [134-138]

An anonymous telephone tip reporting a disturbance in an apartment building, together with subsequent independent corroboration, exhibited sufficient indicia of reliability to provide reasonable suspicion for police to make an investigatory stop of two individuals leaving the building, and the police acted reasonably in ordering the individuals to return inside the building during the initial investigative inquiry. [139-141]

Where a Spanish-speaking criminal defendant was held in police detention for seven hours prior to questioning, due not to any misconduct by police, but rather to the unavailability of Spanish-speaking officers, the delay, without more, was not so unconstitutionally coercive in nature as to render the defendant's subsequent statements to police involuntary or to negate the voluntariness of the defendant's waiver of his Miranda rights. [141-144]

Discussion of the issues regarding the admissibility, on retrial, of expert psychological evidence concerning the effects of dissociative trance disorder on a criminal defendant. [144-146]

INDICTMENT found and returned in the Superior Court Department on January 30, 1996.

A pretrial motion to suppress evidence was heard by *Bertha*

*D. Josephson*, J., and the case was tried before *Richard F. Connon*, J.

*John M. Thompson* for the defendant.

*Deborah D. Ahlstrom*, Assistant District Attorney, for the Commonwealth.

BERRY, J. We reverse this second degree murder conviction because of flawed provocation and voluntary manslaughter instructions held defective in *Commonwealth* v. *Acevedo*, 427 Mass. 714 (1998). In addition to the erroneous instructions, we also address the following issues because they may arise on a retrial: (a) the denial of a suppression motion directed at the initial investigatory stop, where the originating source was an anonymous telephone tip; (b) the denial of the suppression motion on the basis of the voluntariness of the defendant's statement given after he had been held in detention for a significant period of time because of the unavailability of Spanish-speaking officers; and (c) the exclusion under the *Daubert-Lanigan*[1] "gatekeeper" analysis of expert neuropsychological evidence concerning dissociative trance disorder.

1. *Background facts.* The following are the pertinent facts distilled from the trial record; additional factual details are set forth in connection with analyses of particular issues. At approximately 12:00 A.M. on January 21, 1996, Miseal Mendez, one of the leaders of the Latin Kings gang, was stabbed to death in the hallway of an apartment building in Holyoke. At a different location earlier that evening at approximately 7:00 P.M., the defendant's brother, Jose Richard Montanez (Richard), had been beaten by Mendez and the Latin Kings. The attack ended with a death threat delivered by Mendez: "I swear I'm going to kill you today. I don't fool around. I'm the King's Love." Richard retreated. He called the defendant, who was at home. The defendant and Richard went to meet with another brother, Jose Alberto Montanez (Alberto), who lived in an apartment at 370 High Street. The three brothers discussed what had happened and what to do to protect Richard. According to the defendant's trial testimony, it was near midnight when someone knocked at the apartment door and told Richard

[1]See generally *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); *Commonwealth* v. *Lanigan*, 419 Mass. 15 (1994).

that a man was looking for him. The man was Mendez. Richard went outside to the hallway. The defendant heard the words: "I told you I was going to kill you." Hearing that threat, the defendant ran into Alberto's bedroom, retrieved a knife, which was in a top dresser drawer, and ran after Richard. (The sheath was later discovered in the drawer.)

The defendant encountered Richard and Mendez fighting in the third-floor hallway. Mendez had a baseball bat and was pushing Richard against the wall as the two struggled over the bat. The defendant tried to intercede and, as he did so, he saw Mendez reach into his right pants pocket. The defendant feared that Mendez had a hidden weapon. As he described the scene in his statement to the police on the night of the killing, "They were struggling over a bat. When I tried to break them up, I noticed that the guy was searching his pockets for something." (Later the police discovered a knife in Mendez's pants, but it had not been opened.) In any event, believing that Mendez would use a hidden weapon against him and his brother, or would kill his brother with the baseball bat, the defendant "swung" the knife and stabbed Mendez. When Mendez continued to resist, the defendant continued wielding the knife and stabbing Mendez in the front and back of his body. In the end, Mendez was stabbed twenty-two times; twelve gashes were in his back.

The defendant, who was then eighteen years old, testified at trial that he was frightened and overwhelmed as he tried to protect his brother and himself. In explaining the defendant's actions, the defense tendered a neuropsychologist who opined on voir dire that, because of the defendant's mental impairments and stress-related disorders, including in particular dissociative trance disorder (DTD), the defendant experienced a total and uncontrollable state of panic. As a consequence the defendant argues that he lost awareness that he was stabbing Mendez repeatedly, thus explaining the number of stab wounds.[2]

2. *Error in the voluntary manslaughter instructions.* There

---

[2]The expert opinion pertaining to DTD and rendered on voir dire was excluded from the trial evidence and its admissibility is one of the appellate issues addressed herein. The expert was permitted to testify about acute stress disorder.

were two fundamental burden-placing errors in the jury instructions relating to provocation and voluntary manslaughter, and the same errors were repeated in supplemental instructions in response to a jury question. The incorrect formulations in the manslaughter charge concerning the allocation of the burden of proof on provocation are virtually identical to the erroneous formulations held to warrant reversal in *Commonwealth* v. *Acevedo*, 427 Mass. 714 (1998); *Commonwealth* v. *Little*, 431 Mass. 782, 787-791 (2000), and *Commonwealth* v. *McLaughlin*, 433 Mass. 558, 561-563 (2001). Contrast *Commonwealth* v. *Fickling*, 434 Mass. 9, 18-20 & n.15 (2001).

The first error was in that part of the charge where the judge instructed on the elements of voluntary manslaughter as follows:

> "In order to prove the defendant guilty of voluntary manslaughter, the Commonwealth must prove to you three elements beyond a reasonable doubt: First, that the defendant inflicted injury upon Mr. Mendez from which he died; second that the defendant, Mr. Montanez, injured Mr. Mendez as a result of the sudden combat or in the heat of passion, or by using excessive force as in self-defense; and third that the homicide was committed unlawfully, without legal excuse or justification, as in the case of self-defense."

With immaterial variations, this is precisely the instruction held to constitute prejudicial error in *Acevedo*. Because the flaws are fully analyzed in *Acevedo*, it is not necessary to restate the legal analysis of that case. It is sufficient to state that, as the Supreme Judicial Court held in *Acevedo*, this "language incorrectly told the jury that malice is negated by provocation only if provocation is proved beyond a reasonable doubt. The correct rule is that, where the evidence raises the possibility that the defendant may have acted on reasonable provocation, the Commonwealth must prove, and the jury must find, beyond a reasonable doubt that the defendant did not act on reasonable provocation." *Id.* at 716.

The second burden-placing error occurred in that part of the charge that described provocation and heat of passion. The judge's charge again misplaced the burden of proof. The instruction stated:

"Therefore, if after your consideration of all of the evidence, you find that the Commonwealth has proved beyond a reasonable doubt that the circumstances preceding or attending the killing were caused by adequate and reasonable provocation by the deceased, or by an act of sudden combat against the defendant of a kind so as to reasonably excite him with passion and anger and fear and nervous excitement or the heat of blood, and thereupon the defendant, under the influence of such passion and before cooling of the blood, killed the victim, you must find the defendant guilty of voluntary manslaughter."

Again, this is precisely the related instruction held to be error in *Acevedo*. Neither of the two erroneous instructions was objected to at trial. Accordingly, our standard of review is whether the errors gave rise to a substantial risk of a miscarriage of justice.[3] In our judgment, both did.

The defense was premised on the facts that there was no reason for Mendez to have appeared at 370 High Street close to midnight — and to have brought a baseball bat in hand and a knife in his pocket — except to execute the death threat delivered earlier that day and repeated by Mendez just before the struggle with Richard commenced. The defense theory was multifaceted and directed at bringing the risk of conviction down from the offense of murder to manslaughter and potentially convincing the jury that Mendez's death was a justified killing and that a not guilty verdict was appropriate.[4] To that end, the defense argued that the Commonwealth failed to prove malice beyond a reasonable doubt and emphasized both provocation by heat of passion and actions in defense (both self-defense and defense of another); and, from there, contended that the defendant's act of stabbing Mendez was justified and that the many stab wounds were not excessive force because the

---

[3]We note, as did the court in *Commonwealth* v. *Lapage*, 435 Mass. 480, 483 n.4 (2001), that "[t]he deficient [voluntary manslaughter] instruction . . . was in common use in the Superior Court at the time of the defendant's trial." *Acevedo* was decided on July 2, 1998, and the defendant's trial began on May 6, 1997.

[4]In counterpoint, there was an eyewitness to the stabbing, and another witness who recounted the defendant's efforts to clean blood from the knife and baseball bat.

defendant never intended to keep stabbing Mendez, but rather lost awareness of what he was doing.

The defendant's trial testimony rested on this defense. It was also the mainstay of the defendant's written statement to the police on the night of the stabbing, and it was articulated in a spontaneous statement the defendant made to an officer he knew, Officer Morales, who happened to pass by the room at the police station where the defendant was being held: "I didn't mean to stab the guy. I was only protecting myself."

Against the backdrop of this theory of defense, we consider whether the errors in the instructions gave rise to a substantial risk of a miscarriage of justice. To reduce a killing to manslaughter, "[e]vidence of heat of passion on reasonable provocation would include evidence 'that something happened which would have been likely to produce in an ordinary person such a state of passion, anger, fear, fright, or nervous excitement as would eclipse his capacity for reflection or restraint.' " *Commonwealth* v. *Vinton*, 432 Mass. 180, 189 (2000), quoting from *Commonwealth* v. *Walden*, 380 Mass. 724, 728 (1980). Here that kind of evidence was present. Correctly instructed, a jury could have found on the evidence that the defendant stabbed Mendez in the heat of a present state of passion, anger, fear, or fright. Given the evidence and the core of the defendant's defense, which rested on the mitigation elements of manslaughter, in viewing the erroneous instruction, "we are left with uncertainty that the defendant's guilt has been fairly adjudicated," the applicable miscarriage of justice standard of review. *Commonwealth* v. *Chase*, 433 Mass. 293, 299 (2001).

In similar circumstances, we reached a determination that there had been a substantial risk of a miscarriage of justice and set aside a second degree murder conviction in *Commonwealth* v. *Grant*, 49 Mass. App. Ct. 169 (2000). As in *Grant*, here "provocation was a live issue at trial entitling the defendant to a proper instruction on the Commonwealth's burden of proof on provocation." *Id.* at 173.

Finally, the risk of a miscarriage of justice was compounded in that the instructions that wrongly placed the burden of proof were articulated four times — twice in the main charge and twice in the supplemental charge. This is particularly problem-

atic because a supplemental charge was given in response to a jury question about possible verdicts and erroneously instructed the jury on malice and provocation in inflicting bodily harm which, of course, is the dividing line between murder and manslaughter. That there were points in the charge where the judge correctly stated the burden of proof did not negate the error four times stated. While a reviewing court should view the charge as a whole, the risk here is too great that the instances where the burden was correctly defined were lost in the thicket. See generally *Commonwealth* v. *Lapage*, 435 Mass. 480 (2001).[5]

3. *The suppression issues.* We discuss the suppression issues that have been argued in this appeal and may be raised again at retrial. The motion to suppress asserted that the anonymous call to the police station and the subsequent *Terry*[6] stop were constitutionally flawed, rendering all the ensuing evidentiary discoveries subject to suppression as poisoned fruit.

A. *The anonymous tip and the investigatory stop.* The background facts taken from the judge's findings and contextual uncontroverted evidence adduced at the suppression hearing are as follows. Immediately following a call to the police department from an unidentified person, at approximately 12:10 A.M. on January 21, 1996, the radio dispatcher issued the following bulletin: "Disturbance on third floor, 370 High Street. Someone hitting someone." Within one minute of the dispatch, three responding police officers arrived at 370 High Street. The officers observed two men hurriedly leaving the apartment building, one of whom looked as though he had been in a fight because he had a swollen, red face, with puffy lips and swollen eyes.

The three officers approached the two men, who were the defendant and his brother Richard. Officer Monaghan, speaking in English, and Officer Rodriguez, speaking in Spanish, told the two to "hold on" and explained that they were investigating a fight. The officers directed the two men back inside the building. Inside the door, there was a narrow hallway with a staircase,

---

[5]Given the determination that reversal is warranted because of the *Acevedo* error in the manslaughter instruction, we do not reach the other appellate challenges to the jury instructions. See *Commonwealth* v. *Little*, 431 Mass. at 791 n.8.

[6]*Terry* v. *Ohio*, 392 U.S. 1 (1968).

and the two men began walking up the staircase. The officers followed. Upon reaching the second floor landing, the officers separated. Officer Monaghan stayed on the second floor and followed the defendant and Richard toward apartment 2A. The defendant attempted to hide a knife in a newspaper, but the knife fell out. Officer Monaghan forced the defendant and Richard to the floor and conducted a patfrisk. As he did so, he saw blood stains on the defendant's shoes and sweatshirt, as well as on Richard's sweatshirt. The body of the victim was discovered on the third floor.

"[A]n anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity . . . ." *Alabama* v. *White*, 496 U.S. 325, 329 (1990). Thus, we may assume that "a tip, such as this one, standing alone," would not have justified a *Terry* stop. *Ibid.* However, that does not end, but rather begins the inquiry, because ofttimes the determination of the existence of reasonable suspicion for an investigatory stop based on an anonymous tip will turn on whether subsequent independent corroboration provides indicia of reliability of constitutionally sufficient measure. "[T]here are situations in which an anonymous tip, suitably corroborated, exhibits 'sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop.' " *Florida* v. *J.L.*, 529 U.S. 266, 270 (2000), quoting from *Alabama* v. *White*, 496 U.S. at 327. See *Commonwealth* v. *Mercado*, 422 Mass. 367, 369 (1996); *Commonwealth* v. *Heughan*, 40 Mass. App. Ct. 102, 104-105 (1996).

Furthermore, where, as in this case, the anonymous call is the predicate for a *Terry* stop, rather than for an arrest, "reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause." *Alabama* v. *White*, 496 U.S. at 330. See *Commonwealth* v. *Lyons*, 409 Mass. 16 (1990). Even under the lesser standard of reasonable suspicion for a threshold inquiry, however, "[t]he reasonable suspicion here at issue [for a *Terry* stop] requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person [suspected to have committed a crime]. Cf. 4 LaFave, Search

and Seizure § 9.4(h), p. 213 (3d ed. 1996) (distinguishing reliability as to identification, which is often important in other criminal law contexts, from reliability as to the likelihood of criminal activity, which is central in anonymous-tip cases)." *Florida* v. *J.L.*, 529 U.S. at 272.

We apply these constitutional principles to the mosaic of uniquely predictive information in the anonymous call, as aggregated with the corroborative facts developed by the responding police. All tolled, we conclude sufficient factual levels were reached to satisfy constitutional requirements. First, albeit anonymous, the caller conveyed information with measurable qualifying indicia of reliability, describing a particular building and floor and "demonstrat[ing] inside information," *Alabama* v. *White*, 496 U.S. at 332, and contemporaneous first-hand observations of a present fracas and "someone hitting someone." See *Commonwealth* v. *Alvarado*, 423 Mass. 266, 272 (1996) ("specificity of nonobvious facts"). Second, it took just one minute for the police to arrive and see (before the *Terry* stop) two men hurriedly exiting from the very building identified by the caller. "[T]he description here was not stale news, but right up to the hour, if not to the minute." *Commonwealth* v. *Borges*, 395 Mass. 788, 798 (1985) (Hennessey, J., concurring). Third, the police observed (again before the *Terry* stop) that one of the men had a bruised face, reflective of having been hit in a fight, consistent with the predictive information relayed by the call. *Alabama* v. *White*, 496 U.S. at 332. *Commonwealth* v. *Grinkley*, 44 Mass. App. Ct. 62, 70, 71 (1997). Fourth, it was reasonable for the police to draw the rational inference that a crime had been committed. "The crimes which the [radio] reports [describing a fight in progress] reasonably may have reflected include assault, assault with a dangerous weapon, and discharging a firearm within five hundred feet of a dwelling or other building." *Commonwealth* v. *Gunther G.*, 45 Mass. App. Ct. 116, 119 (1998). So viewed, all of this factual development establishes that the "tip [was] reliable in its assertion of illegality." *Florida* v. *J.L.* 529 U.S. at 272.

B. *The order to move inside the building during the investigatory* Terry *stop.* The officers' order to the two men to return inside the building during the initial investigative inquiry was

reasonable. Indeed, in the seminal case of *Terry* v. *Ohio*, 329
U.S. 1 (1968), during an investigatory stop, the officer "ordered
all three men to enter [the] store." *Id.* at 7. By analogy, our
Massachusetts courts "have . . . allowed an officer who detains
a person on reasonable suspicion . . . to transport a defendant
to witnesses for identification purposes." *Commonwealth* v.
*Blais*, 428 Mass. 294, 297 (1998). See generally *Commonwealth*
v. *Crowley*, 29 Mass. App. Ct. 1, 4-5 (1990) (collecting cases
from other jurisdictions).

4. *The voluntariness issue and the delay in questioning.* The
defendant argues that his statement should have been suppressed
because it was unconstitutional in two respects: first, the very
length of the seven-hour detention prior to questioning was
unconstitutionally "coercive in nature," rendering the statement
involuntary; and second, the lengthy detention negated the vol-
untariness of the defendant's waiver of his Miranda rights.

The defendant was brought to the Holyoke police station at
12:30 A.M. His interrogation did not begin until approximately
7:30 A.M. During the interim, the defendant was given Miranda
warnings three times. He signed a waiver of Miranda rights,
following the last warning and just before the questioning began.
Before any interrogation, Trooper Medina and Officer McCoy
also arranged for the defendant to call his mother, with whom
he spoke for approximately fifteen minutes. In the signed state-
ment, the defendant provided full details of the night's events
and ultimately admitted that he stabbed Mendez during a fight,
but as in his trial testimony, the defendant claimed that he had
acted because Mendez was attacking his brother with a baseball
bat and he believed Mendez was armed with a hidden weapon.

A. *Analysis of the prolonged detention and voluntariness of
the defendant's statement.* The six-hour bright-line exclusionary
rule announced prospectively in *Commonwealth* v. *Rosario*, 422
Mass. 48 (1996), does not apply to this case.[7] *Commonwealth* v.
*Beland*, 436 Mass. 273, 282-283 (2002). In the absence of the

---

[7]In *Commonwealth* v. *Rosario*, the court "adopt[ed] for the future, with
respect to police questioning of an arrested person, a rule . . . [that] [a]n
otherwise admissible statement is not to be excluded on the ground of
unreasonable delay in arraignment, if the statement is made within six hours
of the arrest (day or night), or if (at any time) the defendant made an informed

bright-line rule, we consider first, whether delay was "so egregious as to put this aspect [the voluntary nature] of a defendant's statements in doubt"; and second, whether the "the police have engaged in misconduct, other than delay, that would justify suppression as a deterrent against similar future conduct . . . ." *Commonwealth* v. *Butler,* 423 Mass. 517, 525 (1996).

On the latter point, we discern no police misconduct that would warrant suppression as a deterrent. *Ibid.* To the contrary, the delay in questioning, in the main, was attributable to the unfortunate fact that on this night there was a special need for Spanish-speaking officers (when fewer than the usual number were available) to interview simultaneously the three Spanish-speaking Montanez brothers, who were all implicated in the crime, and other potential Spanish-speaking witnesses at the crime scene. Indeed, given the limited availability of Spanish-speaking police officers in the Holyoke police department on that night, it became necessary to call in two bilingual State troopers who promptly undertook interviews of two of the Montanez brothers being held at the station and turned to the defendant as soon as practicable. In *Commonwealth* v. *Ardon,* 428 Mass. 496, 500 (1998), the court expressly declined to implement a rule requiring that "every police department have readily available independent interpreters for every non-English speaking suspect," and concluded "that suspects' rights are adequately protected by the rule requiring the Commonwealth to prove a voluntary and intelligent waiver of Miranda rights."

The voluntariness of a statement is measured by "whether, in light of the totality of the circumstances surrounding the making of the statement, the will of the defendant was overborne to the extent that the statement was not the result of a free and voluntary act." *Commonwealth* v. *Raymond,* 424 Mass. 382, 395 (1997), quoting from *Commonwealth* v. *Selby,* 420 Mass. 656, 663 (1995).

Viewed in totality,[8] the circumstances attending the defendant's questioning do not cast doubt on the voluntariness of his

and voluntary written or recorded waiver of his right to be arraigned without unreasonable delay." *Id.* at 56.

[8]The defendant, on appeal, says he was experiencing pain in his hand. However, at no time prior to his statement did he complain of an injury.

statement.[9] During his interview, the defendant appeared alert, coherent, and calm. Having fallen asleep from time to time during the night, the defendant was not sleep-deprived. The conditions of the defendant's custody were less than draconian; he was not confined to a cell, but rather sat in a police file room. In addition, prior to the questioning the defendant had communication with other persons, including most importantly his telephone contact with his mother.[10] Given the foregoing, the "most usual forms [of coercion] . . . continuous questioning and denial of access to friends, family, and counsel" were not

---

"There was no evidence that the defendant's physical condition was so disabling as to render his statement involuntary." *Commonwealth* v. *Colon-Cruz*, 408 Mass. 533, 539 (1990). Much later in the day, when the defendant stated he felt pain in his thumb, he was taken to a hospital where he was treated for a broken thumb.

[9]The motion judge also considered that, during the course of the night, the defendant had spoken with Alberto's brother-in-law, Holyoke police Officer Emil Morales, who was at the station for a time. Officer Morales was not assigned to the investigation because of family connections. At some point, the defendant asked Officer Morales whether he would "do ten to twenty years" and said he "did not mean to stab the guy," but had acted in self-defense. The defendant objected at trial to the admission of the statements to Officer Morales; however, the defendant did not file a motion to suppress his statements and did not address the issue in his brief to this court. Accordingly, the issue is deemed waived. See *Commonwealth* v. *Springer*, 49 Mass. App. Ct. 469, 475 (2000). Because the issue may arise in any retrial, we note that this exchange, initiated by the defendant and ending in spontaneous statements by him, is similar to the unsolicited statement addressed in *Commonwealth* v. *Iglesias*, 426 Mass. 574 (1998). In that case, as here, "[a]ny challenge to this statement would fail as the judge properly found that the statement was made spontaneously and voluntarily by the defendant, and not in response to any questioning by police." *Id.* at 578 n.1.

[10]At some point during the night, an individual named Jose Melina came to the police station. Melina was an attorney; however, he came in his role as "family friend" and did not indicate that he was there as legal counsel. Melina delivered food and a change of clothing to the defendant and spoke with him. The motion judge found that the conversation with Melina occurred before the defendant's interview by the police. The defendant's brief challenges that finding as clearly erroneous and not supported by the evidence. The record is unclear concerning when the meeting occurred — certain references suggest that Melina was present early during the night, but may not have seen the defendant until after the interview. Given the ambiguities in the record evidence, we cannot reconstruct the precise sequence. Thus, we have not taken into account that the defendant may have had the opportunity to speak with this friend prior to giving his statement.

present here. *Commonwealth* v. *Makarewicz*, 333 Mass. 575, 585-586 (1956).

B. *Analysis of the waiver of Miranda rights*. Although the voluntariness of a Miranda waiver and the voluntariness of a statement are separate and distinct inquiries, the same "totality of the circumstances" test is used in each instance. *Commonwealth* v. *Edwards*, 420 Mass. 666, 670 (1995). Both issues "share many of the same relevant factors." *Id.* at 673. In detailed findings, the motion judge found that the defendant's Miranda waiver was made voluntarily, knowingly, and intelligently. Based on our independent review, we also conclude that the evidence supports the conclusion that the defendant's Miranda waiver was voluntary.[11]

5. *Exclusion of expert psychological evidence*. During a voir dire hearing, Julia Ramos-Grenier, Ph.D., a forensic neuropsychologist, opined that, at the time of the killing, the defendant lacked the ability to conform his conduct to the requirements of the law because he was suffering from the combined effects of DTD, moderate diffused neurological impairment, acute stress disorder, and mild generalized anxiety disorder. According to the psychologist, these combined disorders meant that, at the time of the murder, the defendant was in a dissociative, trance-like state triggered by a panic attack because of his own fear of being killed. The short of it was that, in her opinion, given his mental condition, the defendant at the time of the stabbing did not know what he was doing and would have been unable to formulate a plan or to act with intent. Grenier stated that this condition would explain the twenty-two knife slashes to the victim, as the defendant lost awareness of what he was doing. Following the voir dire, the judge allowed the admission of certain evidence concerning acute stress disorder in relation to intent, but excluded the expert evidence on DTD as "new and novel" and not scientifically reliable. We review this evidentiary ruling because the issue may arise on a retrial.

Appellate review of a trial judge's *Daubert-Lanigan* gate-

[11]The defendant, albeit somewhat ambiguously, asserts that his consent to hair and blood tests was not voluntarily given. For all of the reasons that we have previously discussed concerning the voluntariness of the defendant's statements, we conclude these consents were also valid and voluntarily given.

keeper determination to close the latch and to block expert evidence is governed by the abuse of discretion standard. *Canavan's Case*, 432 Mass. 304, 311 (2000). *Commonwealth* v. *Soares*, 51 Mass. App. Ct. 273, 281 (2001). See generally *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); *Commonwealth* v. *Lanigan*, 419 Mass. 15 (1994). In marking the measuring line between admissible reliable scientific evidence and "excluding expertise that is *fausse* and science that is junky," *Kumho Tire Co.* v. *Carmichael*, 526 U.S. 137, 159 (1999) (Scalia, J., concurring), relevant factors include: (1) whether the theory or technique underlying the opinion is generally accepted in the relevant scientific community; (2) whether it has been subjected to peer review and publication; (3) whether it can be, or has been, tested, and the outcome of such testing; and (4) whether an error rate or any controls or standardization exists. *Daubert*, 509 U.S. at 592-594. See *Lanigan*, 419 Mass. at 25-26; *Canavan's Case*, 432 Mass. at 304-305; *Higgins* v. *Delta Elevator Serv. Corp.*, 45 Mass. App. Ct. 643, 646 (1998). But see *Canavan's Case*, 432 Mass. at 318 (Greaney, J., concurring) (questioning *Lanigan*'s application "to expert testimony in the so-called 'soft' sciences, such as psychology and sociology . . . ").

The judge's basis for exclusion was that expert evidence concerning DTD "has not been tested [and] . . . is not falsifiable, that associated trance disorder is new and novel, it's not sufficiently reliable, and it's still being researched. It's a new and evolving theory . . . ." However, this trial record does not support that basis for exclusion. The record indicated that DTD is a recognized *research* category in the Diagnostic and Statistical Manual of Mental Disorders (4th ed. 2000) (DSM-IV). DSM-IV, research criteria § A(1)(b), at 729. That the condition is not codified as a specific *diagnostic* category in DSM-IV does not mean that it is not a recognized disorder. Cf. *Commonwealth* v. *Monico*, 396 Mass. 793, 803-806 (1986) (holding that expert evidence regarding postconcussional disorder, a DSM-IV research *category* [although not so identified in the

opinion], should have been admitted).[12] Furthermore, DTD has been the subject of peer review articles and publications, including two treatises cited by Grenier. Diagnosis of the condition utilizes generally accepted testing instruments, including the dissociation questionnaire, the dissociation assessment form, the structured clinical interview for DSM-IV dissociative disorders, and the DTD diagnostic worksheet. However, an introductory section to DSM-IV entitled "Use of DSM-IV in Forensic Settings" cautions that: "When the DSM-IV categories, criteria, and textual descriptions are employed for forensic purposes, there are significant risks that diagnostic information will be misused or misunderstood." DSM-IV at xxiii.

In light of this foundation, if expert evidence concerning DTD that is similar in nature and substance to that expressed by Grenier on voir dire in this trial is proffered at any retrial of this case, a gatekeeper exclusion under the *Daubert-Lanigan* line of cases would not be warranted. However, should the Commonwealth offer rebutting information materially undermining the scientific reliability of, and recognition in the psychiatric profession of, the diagnosis of DTD as a mental condition, then the admissibility of the expert evidence concerning DTD may not be warranted. Compare *Commonwealth* v. *Sands*, 424 Mass. 184, 189 (1997). Consideration of such issues remains within the discretion of the judge presiding over any retrial.

Whether the evidence presented entitles the defendant to an instruction on the basis of *Commonwealth* v. *McHoul*, 352 Mass. 544 (1967), will be decided by the trial judge on the basis of all the evidence presented. See *Commonwealth* v. *Hall*, 45 Mass. App. Ct. 146, 152-153 (1998).

6. *Conclusion.* The denial of the motion to suppress evidence

---

[12]While neither this court nor the Supreme Judicial Court has directly addressed the admissibility of DTD expert evidence, case law indicates that expert evidence relating to dissociation, dissociative disorder, and dissociative reaction has been generally admitted by the trial courts and so noted in appellate review. See, e.g., *Commonwealth* v. *Shelley*, 374 Mass. 466 (1978), *S.C.*, 381 Mass. 340 (1980); *Commonwealth* v. *Donahue*, 430 Mass. 710 (2000); *Commonwealth* v. *Seabrooks*, 433 Mass. 439 (2001). But see *Commonwealth* v. *Laliberty*, 373 Mass. 238 (1977).

and the defendant's statement is affirmed. The judgment is reversed, and the verdict is set aside.[13]

*So ordered.*

---

[13]In light of the reversal, we also do not address the issue concerning the jury inquiry and the resulting conference held in chambers rather than in open court, which the defendant challenges as violative of his constitutional right to be present at all phases of a public trial. We observe that the written note to the jury was an appropriate response to their inquiry.